# TEXAS & PACIFIC RAILWAY COMPANY *v.* REISS.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 77.   Argued November 27, December 2, 1901.—Decided January 13, 1902.

Where goods are carried by connecting railways, as between intermediate carriers, the duty of the one in possession at the end of his route is to deliver the goods to the succeeding carrier, or notify him of their arrival, and the former is not relieved of responsibility by unloading the goods at the end of his route and storing them in his warehouse without delivery or notice to or any attempt to deliver to his successor.

In this case it cannot be claimed that the defendant had either actually or constructively delivered the cotton to the steamship company at the time of the fire.

If there be any doubt from the language used in a bill of lading, as to its proper meaning or construction, the words should be construed most strongly against the issuer of the bill.

In such a bill if there be any doubt arising from the language used as to its proper meaning and construction, the words should be construed most strongly against the companies.

It cannot reasonably be said that within the meaning of this contract the property awaits further conveyance the moment it has been unloaded from the cars.

The defendant at the time of the fire was under obligation as a common carrier, and was liable for the destruction of the cotton.

THIS action was brought in the Circuit Court of the United States for the Southern District of New York by the plaintiffs, who are defendants in error here, and are residents of Liverpool, England, to recover the value of some two hundred bales of cotton destroyed by fire at Westwego, Louisiana, opposite the city of New Orleans, November 12, 1894, at a pier on the west bank of the Mississippi River, owned by the plaintiff in error.   This is the same fire which is mentioned in *Texas & Pacific Railway Company* v. *Clayton*, 173 U. S. 348.   Upon the first trial the court directed a verdict in favor of the defendant, but the judgment entered thereon was reversed by the Circuit Court of Appeals, 98 Fed. Rep. 533, and a new trial

granted. Upon the second trial the court, following the opinion of the Circuit Court of Appeals, directed a verdict for the plaintiffs for the value of the cotton, and the judgment entered upon that verdict having been affirmed by the Circuit Court of Appeals on the authority of its former opinion, 99 Fed. Rep. 1006, the railway company brings the case here by writ of error. The defence of the company is based upon a clause in the bill of lading which will be set out hereafter.

The cotton had been shipped at Temple, in the State of Texas, on the Missouri, Kansas and Texas Railway, to be carried over its road and the defendant's road to New Orleans, and from that port to Bremen. It arrived at New Orleans at the pier of the railway company November 6, 1894. One hundred and sixty bales were unloaded on November 7, and the balance soon thereafter, but on what day is not certain. One hundred and twenty bales were unloaded and placed at one point, and two different lots of forty bales each were deposited at other points, thus leaving the cotton at three different points on the pier of the railway company. At this time the pier was quite full, there being over twenty thousand bales deposited upon it and some eight thousand bales in cars waiting to be unloaded. The pier was built, owned and in the exclusive possession of the railway company. The bill of lading which was issued at Temple, in the State of Texas, by the Missouri, Kansas and Texas Railway, expressed on its face to be on behalf of that company and also the defendant company and the steamship company. It was an elaborate document, and purported to be "an export bill of lading approved by the permanent committee on uniform bill of lading." It acknowledged the receipt of the cotton consigned as marked and to be carried to the port of New Orleans, Louisiana, and thence by the Elder, Dempster & Company's steamship line to the port of Bremen, Germany. It had conditions which are stated to be:

"(1) With respect to the service until delivery at the port of New Orleans, Louisiana."

"(2) With respect to the service after delivery at the port of New Orleans, Louisiana."

There are twelve clauses relating to the service until delivery

and fifteen clauses relating specifically to the service after delivery at the port of New Orleans. Those clauses which are specifically referred to in this case are numbered 3, 11 and 12 in the bill of lading. They read as follows:

" 3. No carrier shall be liable for loss or damage not occurring on its own road or its portion of the through route, nor after said property is ready for delivery to the next carrier or to consignee. . . ."

" 11. No carrier shall be liable for delay, nor in any other respect than as warehousemen, while the said property awaits further conveyance, and in case the whole or any part of the property specified herein be prevented by any cause from going from said port in the first steamer, of the ocean line above stated, leaving after the arrival of such property at said port, the carrier hereunder then in possession is at liberty to forward said property by succeeding steamer of said line, or, if deemed necessary, by any other steamer.

" 12. This contract is executed and accomplished, and all liability hereunder terminates on the delivery of the said property to the steamship, her master, agent or servants, or to the steamship company, or on the steamship pier at the said port, and the inland freight charges shall be a first lien due and payable by the steamship company."

The usual method of handling cotton upon its arrival at the pier of the company at Westwego, Louisiana, is stated, as both counsel in this case agree, with substantial accuracy in *Texas & Pacific Railway Company* v. *Clayton*, 173 U. S. 348, 352, as follows:

" The mode in which the railway company and the steamship company transacted business was as follows: Upon the shipment of cotton, bills of lading would be issued in Texas to the shipper. Thereupon the cotton would be loaded in the cars of the railway company and a way bill indicating the number and initial of the car, the number of the bill of lading, the date of shipment, the number of bales of cotton, the consignor, the consignee, the date of the bill of lading, the number of bales forwarded on that particular way bill, the marks of the cotton, the weight, rate, freights, amount prepaid, etc., would be given to

the conductor of the train bringing the car to Westwego. Upon the receipt of the way bill and car at Westwego, a 'skeleton' would be made out by the clerks at that place for the purpose of unloading the car properly. It contained the essential items of information covered by the way bill, and had also the date of the making of the skeleton. When this skeleton had thus been made out and the car had been pushed in on the side track in the rear of the wharf, it would be taken by a clerk known as a 'check clerk,' and with a gang of laborers, who actually handled the cotton and were employed by the railway company, the car would be opened; and as the cotton was taken from the car bale by bale the marks would be examined to see that they corresponded with the items on the skeleton, and the same were then checked. The cotton thus taken from the car was deposited at a place on the wharf designated by the check clerk, and it would remain there until the steamship company came and took it away. After the checking of the cotton in this way to ascertain that the amounts, marks and general information of the way bill were correct, the skeleton would be transmitted to the general office of the Texas and Pacific Railway Company in New Orleans, which thereupon would make out what was designated as a 'transfer sheet' that contained substantially the information contained in the way bill, and which being at once transmitted to the steamship company or its agents was a notification understood by the steamship company's agents that cotton for their line was on the wharf at Westwego ready for them to come and take away. Upon the receipt of these transfer sheets the steamship company would collate the transfers relating to such cotton as was destined by them for a particular vessel; advise the railway company with the return of the transfers that this cotton would be taken by the vessel named, and would thereupon send the vessel with their stevedores to the wharf at Westwego. The clerk at Westwego would go around the wharf and by the aid of the transfers returned from the steamship agents point out to the master or mate of the vessel, or the one in charge of the loading, the particular lots of cotton named in the transfers and designated for his vessel, and the stevedores and their helpers would thereupon take the cotton

and put it on board the ship. In connection with the loading upon the vessel or after the cotton was pointed out in lots, the master or mate would sign a mate's receipt for this cotton. The stevedores and all men employed in loading the vessel were wholly in the employ of the steamship company. The time of coming to take cotton from the wharf was entirely in the control of the steamship company. They sent for it as soon as they were ready."

At the time of the fire it is conceded that no transfer or skeleton sheets had been sent to the steamship company or notice given it of the arrival of this cotton at the pier of the railway company.

*Mr. Rush Taggart* and *Mr. Arthur H. Masten* for plaintiff in error.

*Mr. George Richards* for defendants in error. *Mr. Frederic E. Mygatt* and *Mr. Treadwell Cleveland* were on his brief.

MR. JUSTICE PECKHAM, after making the foregoing statement of facts, delivered the opinion of the court.

In this case there had been no delivery of the cotton by the railway company prior to its destruction by fire. The cotton had arrived at the pier of the railway company but no notification of its arrival had been given to the steamship company, nor was it in fact in the possession of nor had it been delivered to the latter company. It was still under the absolute control and in the possession of the railway company, and nothing had been done to terminate its common law liability at the time the fire occurred.

In *Myrick* v. *Michigan Central Railroad Company*, 107 U. S. 102, Mr. Justice Field, delivering the opinion of the court and speaking of the duty of a connecting carrier, at page 106 said :

" If the road of the company connects with other roads, and goods are received for transportation beyond the termination of its own line, there is superadded to its duty as a common carrier, that of a forwarder by the connecting line; that is, to

deliver safely the goods to such line,—the next carrier on the route beyond."

As between intermediate carriers, the duty of the one in possession at the end of his route is to deliver the goods to the succeeding carrier or notify him of their arrival, and the former is not relieved of responsibility by unloading the goods at the end of his route and storing them in his warehouse without delivery or notice to or any attempt to deliver to his successor. *McDonald* v. *Western Railroad Company*, 34 N. Y. 497; *Congdon* v. *Marquette H. & O. Railroad Company*, 55 Mich. 218. In the latter case it is held that the duty of the connecting carrier is not discharged until it has been imposed upon the succeeding carrier, and this is not done until there is delivery of the goods, or at least until there is such a notification to the succeeding carrier as according to the course of business is equivalent to a tender of delivery.

Within these cases it cannot be claimed that this defendant had either actually or constructively delivered the cotton to the steamship company at the time of the fire. The defendant is compelled, therefore, to have recourse to the clauses in the bill of lading in its attempt to rid itself of liability consequent upon the destruction of the cotton by a fire while at its pier and in its possession. The bill of lading itself is an elaborate document, bearing on its face evidences of care and deliberation in the formation of the conditions of the liability of the companies issuing it. The language is chosen by the companies for the purpose, among others, of limiting and diminishing their common law liabilities, and if there be any doubt arising from the language used as to its proper meaning or construction, the words should be construed most strongly against the companies, because their officers or agents prepared the instrument, and as the court is to interpret such language, it is, as stated by Mr. Justice Harlan, in delivering the opinion of the court in *National Bank* v. *Insurance Company*, 95 U. S. 673, 679: "Both reasonable and just that its own words should be construed most strongly against itself." To the same effect is *London Assurance &c.* v. *Companhia &c.*, 167 U. S. 149, 159, and *Queen of the Pacific*, 180 U. S. 49, 52.

We come then to an examination of the bill of lading for the purpose of determining whether the railway company has been exempted from liability by any of its provisions.

We do not understand it is contended that either clause 3 or 12 applies, because, as is conceded, there was never any notification given the steamship company of the arrival of this cotton. Without that notification counsel does not contend that either of those clauses applies. The argument at the bar was devoted to maintaining the proposition that the railway company was exempted under clause 11, and the other clauses in the bill of lading were referred to for the purpose of giving point to that contention. It was urged at the bar that under the eleventh clause the question of notification was immaterial, because, although a notification had not been given, yet the cotton, upon its arrival at the pier and after it had been unloaded from the cars, "awaited further conveyance," within the meaning of the eleventh clause, and while awaiting further conveyance the carrier was by the express terms of that clause relieved from liability otherwise than as warehouseman. In other words, that the carrier upon the arrival of the cotton and unloading it at the pier, and without giving any notification of its arrival, ceased to be a carrier and became liable only for negligence which might cause the loss of the property, and there being no negligence proved in this case, the carrier was not liable.

It was argued that clauses 3 and 12 were intended to cover such a case as would have existed in the one now before us had notice been given to the steamship company of the arrival of the cotton at Westwego, such notice being understood by the steamship company as a request to come and take away the cotton, and in holding, as the court below did, that notification was necessary before the eleventh clause could apply, that clause was thereby deprived of any separate effect, because after notification the third or the twelfth clause would exempt the carrier, and therefore some further or other meaning must be given the eleventh clause, so that it may operate in a case where no other clause would be available.

Upon this subject Circuit Judge Shipman, in the court below, said:

"It is not claimed that the facts bring the carrier's liability within clause 3 of the bill of lading, which says that the liability shall end after the property 'is ready for delivery' to the next carrier, for it is conceded that the goods are not awaiting delivery before any notification of their arrival to the connecting carrier. *McKinney* v. *Jewett*, 90 N. Y. 267. It is, however, insisted that the fair construction of clause 11 is that, when the act of transportation of the cotton to the wharf at Westwego has been accomplished, and it has been stacked on the wharf, and 'is awaiting further action in the way of notification and advice to the succeeding carrier,' it awaits further conveyance. By this construction the parties substituted an immediate cessation of the liability of a carrier, and the assumption of the liability of a warehouseman for the liability imposed by the common law, and doubtless they were at liberty to make a contract of limitation which will be enforced if the language of the bill of lading clearly indicates that such was their intention. In order to justify the defendant's construction, the claimed extent of the departure from the implied contract of the common law must clearly appear in the language which is used in the special contract. The clause, 'no carrier shall be liable for delay,' when applied to the facts in this case, meant that the defendant should not be liable for the delay of the steamship company, but delay would not occur until it knew or had heard of the time of arrival of the cotton. The same idea of notification to the connecting line must also run through the entire paragraph, and, while the term 'awaiting further conveyance' literally means 'awaiting the time when the next carrier shall take the property in hand,' it seems improbable that it was the intent of the language that the liability of the carrier should terminate upon the deposit of the property upon the wharf. The language is too indefinite to support the conclusion that notice to the connecting line was not a prerequisite to the change of liability to that of a warehouseman. It may well be that such change would take place when the property was awaiting conveyance by the connecting line which had been notified to receive and convey, but until then it is not awaiting conveyance; it is awaiting the action of the first car-

rier.   The term must mean awaiting conveyance by the person upon whom the duty of conveyance devolved, and no such duty devolved until notice of the arrival of the property had been given."

We agree with the views of the court below, as expressed by Judge Shipman.   We do not think that the property can be said to await further conveyance the moment it is dragged upon the pier of the railway company and unloaded from its cars, and before any notification is given to the steamship company that the cotton has arrived and awaits transportation by ship.   In one sense it might be said that property awaited further conveyance if anywhere along the line of the railway company an engine of the train should break down, and the train be brought to a standstill for several hours, awaiting a new engine.   In such case the cotton would not have arrived at the termination of the road of the railway company, and in one sense it would certainly be awaiting further conveyance, because it had not arrived at the end of the route; but no one would suppose for a moment that during the time that the train was thus at a standstill the eleventh clause of the bill of lading would be applicable.   No court would give such a construction to the clause as would exempt the company under the circumstances stated.

We are then to look for some fair and reasonable meaning to be given to the term, and we think that the court below has given such meaning to it.   It cannot reasonably be said that within the meaning of that clause the property awaits further conveyance the moment it has been unloaded from the cars on to the pier of the defendant.   As is stated by the Circuit Court, at that time the property awaits the further action of the defendant, and does not await further conveyance until it has become the duty of the succeeding carrier to take it further, after notification that it has arrived and awaits delivery to it.   After that time it may be said to await further conveyance, but up to that time it awaits the further action of the railway company.

This meaning of the clause is not altered even if the language used in other clauses might also grant exemption upon the same

facts. We are not for that reason bound to find some other and different meaning for the eleventh clause than such as we think is obvious and plain upon its face. The various propositions mentioned in these different clauses and the many contingencies provided for therein under which the company might claim exemption render it not surprising that the same ground of exemption should possibly be covered by more than one provision in the bill, or that, in other words, the defendant should upon the same facts be exempt under more than one of its various and perhaps somewhat indefinite clauses. No rule of construction binds us to find some hidden or obscure meaning for a particular clause, because the simple and plain one which is seen upon its face provides for contingencies which may be also provided for in another clause of the same bill.

Reference was made in the opinion of the court below and also upon the argument in this court to the case of *McKinney* v. *Jewett*, 90 N. Y. 267, in relation to a delivery of goods at the termination of the carriage, where the meaning of the phrase "awaiting delivery" was under consideration, the court holding that the phrase implied not only the arrival of the goods but the completion of whatever on the part of the carrier is necessary to be done to leave the risk of further delay upon the consignee; that the goods were "awaiting delivery" only after the duty of the common carrier is done and he is entitled to remain passive awaiting the action of the consignee.

It was objected on the argument at the bar that the case was not in point because of the distinction between awaiting delivery and awaiting carriage, and it is urged that this difference is substantial; that conveyance and delivery are different acts and relate to different parts of the service; that there could be no delivery to the consignee under the New York case until there had been notice in some form to the consignee, while the element of notice had no connection with the act of conveyance of the cotton, which might be entirely complete regardless of notice. The two cases differ, in that the New York case, as counsel says, relates to a delivery at the end of the route, and the case at bar relates to goods awaiting conveyance by a connecting carrier, but in both the question arises as to the mean-

ing of the term "await," and the New York case holds that goods do not await delivery within the meaning of that term as used in the bill of lading until notice of their arrival has been given the consignee, and it seems to us that the same reasoning holds here, and that goods are not awaiting further conveyance by a connecting carrier until the preceding carrier has given him notice of their existence at the place where further conveyance is to be continued.   We do not dispute that there is a distinction between the position of goods awaiting delivery and those awaiting further conveyance, and the fact of such distinction is recognized in *Railroad Company* v. *Manufacturing Company*, 16 Wall. 318, 327, and it is therein stated that there is a clear distinction between property in a state to be delivered free to the consignee on demand and property on its way to a distant point to be taken thence by a connecting carrier.   In the former case it might be said to be awaiting delivery; in the latter to be awaiting transportation.   But the analogy between goods awaiting delivery at the end of the route and goods awaiting further conveyance by a connecting carrier, so far as the requisite of notice in each case is concerned, we think exists and should be recognized.

There having been in this case no notification to the steamship company, without which clauses 3 and 12 do not apply, and we being of the opinion that clause 11 has also no application without notification to the steamship company, it follows that the exemption claimed under the bill of lading is not sustained; that the defendant at the time of the fire was under obligation as a common carrier and liable for the destruction of the cotton, and that the judgment in favor of the plaintiff below was right, and must be

*Affirmed.*