I-Iosea, J.;
Caldwell, J., concurs; IToeei-ieimer, J., dissents.
Error to special term.
Block & Son (herein referred to by initials), plaintiffs below, recovered judgment by consideration of the court at special term against the Standard Distilling Company (herein referred to by initials), defendant below, upon a written contract dated September 14, 1898, in substance as follows:
“1. The S. D. Co. to appoint B. & Co. their ‘authorized dealers. ’
“2. B. & Sons agree to purchase and pay for continuously and exclusively of the S. D. Co. their ‘entire need and supply of spirits and alcohol.’
“3. B. & Co. agree that they will not manufacture spirits and alcohol except such as they may require in making whiskey at their distillery, which whiskey shall be marked as ‘whiskey’ and not as ‘spirits’ and shall not be tax paid less than sis months old.
“4. The S. D. Co. agree to pay to B. & Sons upon compliance with the conditions of this contract, and those of Exhibit A, attached hereto, $1,000 per month.
“5. The contract to continue five years from date.
‘ ‘ 6. Nothing herein to be construed as preventing B. & Sons from manufacturing bourbon, rye or continuous whiskeys or gins.
“7. This agreement to be binding upon the parties, their successors or assigns, and upon any purchaser or transferee of any distillery of B. & Sons, excepting the Pennwick distillery in Pennsylvania.
“8. If the contract is not renewed at the end of five years, any rebates then' due B. & Sons under Exhibit A shall be paid over.”
Exhibit A attached to said contract provided in substance as follows:
*389 1. The S. D. Company appoints B. & Sons one of their “authorized distributors. ’ ’
2. S. D. Co. agrees for the purpose of securing the continuous and exclusive patronage of B. & Sons to allow a rebate of one cent per proof gallon on all spirits, alcohol, double stamped gins, and continuous goods purchased of the S. D. Co. on proof furnished.
3. The S. D. Co. further agree to pay into the treasury of the United States Spirits Association one-half cent per proof gallon on-such purchases.
i. S. D. Co. authorize B. & Sons to use the trade-mark of the S. D. Co. on invoices of goods so purchased.
5. S. D. Co. agrees not to increase rebates or offer any rebates to customers of B. & Sons; and to sell to B. & Sons at same terms as it makes with any of its other “authorized dealers” during the five years.
6. (Reiterates clause 8 of the main contract).
The amended petition below, filed October 30, 1900, setting up this -contract avers that B. & Sons complied with all the conditions on their part to be performed, but that the S. D. Co. failed to pay the installments due from July to December, inclusive, of 1899, and January to April, inclusive, of 1900 — in all $10,000, for which B. & Sons ask judgment with interest from April 30, 1900.
To this petition a general demurrer was filed on November 16, 1900, and overruled on February 20, 1901; and as appears from a memorandum opinion of the court below, the argument in support of the demurrer was based on the claim that the contract in question was void, as being in restraint of trade.
On March 11, 1901, the defendant below answered, setting up as its defenses:
1. A general denial except as to specific admissions relating to the status of parties;
2. That said contract was in violation of the statute law of Kentucky and void;
3. That said contract was in violation of the common law of Kentucky and void.
The reply filed by plaintiff below denied the new matter of the answer apd joined issue as upon its petition. The judg *390 ment of the court below rendered upon a full hearing was in favor of B. & Sons, and this proceeding in error is prosecuted to reverse said judgment.
Both in testimony and argument the defense below was carried quite beyond the issue presented by the pleadings and should have been restrained within those limits. The action was for recovery of money alleged to be due upon a contract; and, while the defendant was fully authorized by the code of civil procedure to interpose legal and equitable defenses by answer, its failure to do so was a waiver as to such as might have been pleaded. Stewart; v. Hoag, 12 Ohio St., 623; Wilte v. Lockwood, 39 Ohio St., 141; Hites v. Irvine, 13 Ohio St., 283.
This being so, the assumption of the invalidity of the contract sued upon, under the theory that it was a mere incident and part of another contract not pleaded, is not tenable and must be discarded here. This case must stand or fall upon the contract pleaded and the issues raised thereon, viz., the written agreement of September 14, 1898 (including its attached Exhibit A), and its alleged breach.
But this contract was made in Ohio, and its main stipulations —to-wit, the sale and purchase of spirits and alcohol, and corresponding payments and concessions — were to be- performed in Ohio; and notwithstanding the reference to the Kentucky distillery (which, as will be shown later, was incidental merely), the issues are to be dealt with under Ohio law and not under the laws of Kentucky.
Strictly speaking, these holdings might be said to dispose of the case, under the issues presented; but as the case was argued upon general doctrines of the common law of Ohio as affecting the pleaded contract, we have considered the case in this aspect.
It is claimed by the plaintiff in error here that the contract is invalid as being in restraint of trade because, it is urged, its main purpose is to restrict and prevent manufacture by plaintiff, and that the real consideration for the agreement to pay $1,000 per month is a restriction which was unreasonable because unlimited in extent. In a word it is claimed that this was an agreement to purchase the defendants in error “out of business,” as phrased in Lufkin Rule Co. v. Fringeli, 57 Ohio St., *391 596. Then follow other suggested objections, couched in terms of inductive reasoning — among them, that the contract tended to enable the plaintiff in error to charge a higher price for goods sold bjr increasing its power to control the market, etc.; and, further, that it does not empower the defendant in error to fix the prices of goods purchased from plaintiffs in error under it.
Manifestly these arguments depend for their cogency upon the construction to be given to the contract itself; and this is obviously a condition precedent to consideration of the legal results flowing from it.
Certain facts surrounding the making of the contract are to be taken into consideration. B. & Sons were dealers in alcohol, spirits, whiskey, etc., and were located and doing business in Cincinnati. They also owned and operated a distillery in Kentucky, and one in Pennsylvania — but the latter being excepted in the contract, cuts no figure here.
The Kentucky distillery was a source of supply in their business as dealers in spirits and alcohol, but to what extent is not shown. Spirits and alcohol are the primary product of the distillation of grains, and may be regarded as the raw material for the manufacture of whiskey, etc.
In construing contracts to ascertain the intention of parties, it is an elemental principle that the parties are to be presumed to intend lawful as opposed to unlawful obligations; and out of this has grown the established rule that where a contract is susceptible of two constructions one of which malees it lawful and the other unlawful, the former is to be adopted. 1 Page, Contracts, 1120; Hobbs v. McLean, 117 U. S., 567.
Extending the same principle to contracts involving restriction of trade, it is held .that they are to be taken, where possible, to impose reasonable as opposed to unreasonable limitations as to time and space (Dethless v. Tamsen, 7 Daly, 354). And this is carried to the extent of arbitrarily discarding what is unreasonable where the context permits a separation as between it and that which is reasonsable (Lange v. Werk, 2 Ohio St., 519). In this connection also the principle of fortius causa proferentem, is applied as between the parties in various relations. London Assur. Co. v. Companhia de Moagens, 167 U. S., 149; Texas & *392 Pac. Ry. v. Reiss, 183 U. S., 621; Laidlaw v. Marye, 133 Cal., 170.
Considering the contract in question in the light of these principles, it seems plain that the primary' object of the contract had relation to the business of B. & Sons as dealers and not as manufacturers ; also, that the parties were contracting with reference to the conditions surrounding the business of B. & Sons as it then existed. .In other words, the parties dealt with an existing status and did not reach out to cover all possibilities of the future, because there was nothing in existing conditions to suggest it. The obligations imposed on B. & Sons were specifically limited in time, and were determinable practically at their will, subject to a possible liability in damages necessarily limited in amount.
Having reference to the supply of spirits and alcohol for resale in their ordinary trade as dealers, the provision as to manufacture in Kentucky was an incident implied in the stipulation for furnishing the “entire need and supply,” and not necessarily a restriction at all; for it could mean nothing else than that B. & Sons should not sell the product of the distillery as spirits ox-alcohol — that is, as raw material — in diminution of the quantity stipulated for. In a word, it is quite supposable within the terms of the contract, that so far from restricting the output of the Kentucky distillery, the arrangement may have tended to ixicrease the same by enabling B. & Sons to convert the entire prodxxct ixxto whiskey to meet a possible increased demand. The view we take of the contract on this point necessarily confines its operation as to territorial scope to the Kentucky distillery, and this we think fully justified by the precise language used, when construed in harmony with the gexieral rules of construction before stated, and in view of the limitations arising out of the main pux-pose of the contract and the conditions surrounding its execution. This applies also to the phrase, “any distillery property belonging to the second party,” because the 'term “belonging” applies strictly to an existing and not a future ownership.
To illustrate the legal status more correctly, let us suppose (1) that B.'& Sons had reached a determination to devote their *393 distillery product entirely to the production of whiskey in view of or anticipating an increased demand in this direction; and, to maintain their independent trade as dealers in spirits and alcohol, should have contracted with other manufacturers for their own “entire need and supply” -of those goods. Certainly no one would claim such a contract to be objectionable in •law. But suppose again (2) that a single outside manufacturer learning of the determination of B. & Sons, should propose to them that if they would bring themselves for a limited period to adhere to their determination to devote their distillery to producing whiskey only and contract-with the proposer for their entire supply of spirits and alcohol for resale, that a certain bonus and certain rebates — in other words, certain reductions in prices —would be given, which would be advantageous to B. & Sons. Upon what ground could such a contract be assailed for illegality! In this connection, we think that an agreement to sell at ‘ ‘ lowest price given any customer ’ ’ must be given a practical construction and not a strained theoretical one. There were other manufacturers, and a market which must necessarily govern prices in a general way. The phrase used is, therefore, practically synonymous with “lowest market price,” in the sense used by the parties; for it must be taken for granted that to be able to make pur chases B. & Sons must be able to resell, and that to resell they must meet the market. The parties must be supposed to have had these things in mind.
Unquestionably, the criterion of validity in contracts involving a suggestion of restraint of trade is their “tendency” to create a monopoly. But, in a sense, “the creation of a corporation involving the combination of the aggregated capital of individuals, the creation of a partnership for the same purpose, or a contract for the entire output of a manufacturer — and indeed very many contractural arrangements daily made among men— do all tend to monopoly. So far, however, from being regarded as objectionable in law, such contracts are held to be the very life of business- and trade.
To fall within the inhibition of the law of public policy contracts must in their purpose and scope plainly tend to restraint *394 .of trade as an independent factor, or, if this restraint is connected with, and incidental to, another main purpose in itself lawful (as the sale of a business), it must be “unreasonable” in its restrictions measured in time and space..
Taking the contract in question here by its four corners, limited, as we are constrained to consider it, by the rules of construction laid down by highest authorities and generally followed by courts everywhere, what is there in it that suggests more than is contained in the second above-supposed case ?
The decision of the late Justice Jackson — justly esteemed as one of the ablest and best equipped lawyers of his day on the Supreme Bench of the United States — in the case of In re Greene, 52 Fed. Rep., 105, is in many respects instructive in this contention. True, that case was brought under the United States trust act, but the act itself is but an embodiment of the general principles involved in laws invalidating contracts in restraint of trade. Judge Jackson held that a contract for rebates, similar to that here in question, was but an effort to “retain patronage against competing manufacturers” and therefore not inhibited by law but a “legitimate method of inducing trade” and did not operate to monopolize trade. To add a bonus to the consideration, in view perhaps of the anticipated magnitude of the transactions to accrue under the contract, does not change its legal character.
There are other cases to the same general effect. See In re Corning, 51 Fed., 205; National Distilling Co. v. Importing Co., 86 Wis., 352; State v. Warehouse Co., 109 La., 64. The question being whether the contract .stipulations tend to monopoly, the contract can not be held invalid under this doctrine unless such tendency be plainly shown, and it does not seem to be so shown here.
In the present case, the contract being for a supply of a,11 spirits and alcohol for sale as such in the business of B. & Sons as dealers, and, incidental thereto, a stipulation not to use the product of their distillery in conflict with this stipulation, but for conversion into whiskey, etc., only — no curtailment of ability to supply all public demands necessarily flowing from the con *395 tract or being shown by evidence — how can it be said that the rights of the public are in any way jeopardized or interfered with ?
Tested by all the considerations usual in such cases, the contract under consideration here does not fall within any of the classes avoided by the statute or by public policy, but rather within those distinguished as free from objection on those accounts. It is, in fact, to our apprehension, one where the restraint is to such extent only “as to afford a fair protection to the party in favor of whom it is given, and not so large as to interfere with the interest of the public.” Page, Contracts, 373, 375 (and a very large number of cases there cited) ; Kevil v. Standard Oil Co., 8 N. P., 311; Lange v. Werk, supra.
The construction we place upon the contract has rendered it unnecessary to follow out in detail all the ramifications of argument suggested in the brief of counsel. It may be noted,, however, that the only suggestion in the present contract which in any way points to some arrangement exterior to itself, as connected with it in the minds of the parties, is in Clause 3 of Exhibit A, stipulating for payment into the treasury of the U. S. Spirits Association. This does not effect the main purpose inferable from the language of the contract but is a detail relating to a payment of part of the stipulated consideration to X instead of to Y. It could only become important when performance is challenged and if declared to. be void it would be lopped off without affecting the general contract as a separable part of the consideration.
We may also say, in conclusion, that even if we are to regard the existence and effect of an agreement between B. & Sons and the United States Spirits Association as within the purview of the present determination, we would be compelled to hold it to be a collateral and severable matter that would have no necessary' bearing on the question at issue here. Upon the whole case we think the judgment of the court below should be affirmed, and it is so ordered.
Judgment affirmed with costs.