CHRISTIAN v. FIRST NAT. BANK OF DEADWOOD, S. D., et al.

(Circuit Court of Appeals, Eighth Circuit. June 10, 1907.)

No. 2,394.

1. CONTRACTS—EQUITABLE INTERPRETATION.

When a contract is fairly open to two constructions, it is legitimate to adopt the one which equity would favor.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, § 734.]

2. SAME—INTERPRETATION WHEN ONE PARTY RESPONSIBLE FOR TERMS EMPLOYED.

If there be doubt as to the true meaning of a written contract, and one of the parties be responsible for the terms employed, it is both just and reasonable that it should be construed most strongly against that party.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Contracts, § 736.]

3. BAILMENT—DUTIES OF BAILEE WITHOUT REWARD NOT LIGHTLY EXTENDED BY INFERENCE.

Courts are indisposed to extend, by inference, the perils of an unprofitable trust; and so it is that every bailee without reward is regarded as having assumed the least responsibility consistent with his actual undertaking.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Bailment, §§ 37–41.]

4. ESCROWS—DUTIES OF DEPOSITARY—CONVERSION.

Three certificates of stock in a mining company, indorsed in blank and representing shares held by several co-owners, were deposited by them in a bank under an option contract of sale (fully set forth in the opinion), containing provisions for the delivery of the stock to the purchaser upon payment of the purchase price, and for the surrender of the stock to the depositors in the event of default in the payment of the purchase price. The purchaser made default, and one of the depositors then called upon the bank to make a distribution or division of the shares represented by the certificates among the depositors according to their respective interests, and to procure from the mining company and deliver to the demandant a separate certificate for his interest. The bank did not comply with the demand, and thereupon the demandant sued it for conversion. Held, upon full consideration of the terms of the contract and of the rules of interpretation before stated, that it did not impose upon the bank the duty of distributing or dividing the stock among the several co-owners, or of procuring for and delivering to each a separate certificate for the shares to which he might be entitled, as between himself and his co-owners, and that therefore the bank's failure to comply with the demand did not constitute a conversion of the demandant's interest in the stock.

In Error to the Circuit Court of the United States for the District of South Dakota.

Carle Whitehead (Robert C. Hayes and William B. Shattuc, on the brief), for plaintiff in error.

Norman T. Mason (Eben W. Martin, on the brief), for defendants in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

VAN DEVANTER, Circuit Judge. This was an action of trover against the First National Bank of Deadwood, S. D., and the Oro Hondo Gold Mining Company for the alleged conversion of a large

number of shares of the capital stock of the mining company claimed by the plaintiff, Thomas Christian. At the trial, which was to a jury, the evidence, without any conflict, established these facts: The plain-tiff and 11 other co-owners of less than the entire number of shares, represented by three stock certificates issued by the mining company, deposited the certificates with the defendant bank for the purposes and upon the terms named in the following agreement:

(1) This envelope contains two million, one hundred and twenty thousand (2,120,000) shares of the capital stock of the Oro Hondo Mining Company, evidenced by certificates as follows, to wit: Certificate No. 19, for five hundred and five thousand (505,000) shares, certificate No. 20 for seven hundred and fifty-seven thousand five hundred (757,500) shares, certificate No. 21, for seven hundred and fifty-seven thousand five hundred (757,500) shares, of the par value of one dollar per share; which said certificates of stock are issued to George M. Nix, and by him assigned in blank.

(2) One million, nine hundred ninety-eight thousand eight hundred and eighty (1,998,880) shares of said stock belong to the parties named below, signing this escrow, and are placed by the undersigned in escrow with the First National Bank of Deadwood, South Dakota, upon the following terms and conditions:

(3) All of said stock may be purchased by said George M. Nix for the sum of ninety-nine thousand nine hundred and forty-four ($99,944.00) dollars, less a commission of ten (10%) per cent. to be paid to said George M. Nix as payments are made upon this escrow.

(4) On or before the 1st day of April, 1903, the said George M. Nix or his assigns must pay all of the parties signing this escrow, except himself, or deposit to their order in the First National Bank of Deadwood, South Dakota, the sum of twenty-two thousand, four hundred eighty-seven and forty one-hundredths ($22,487.40) dollars, and shall then have the privilege of withdrawing twenty-five (25%) per cent. of said stock so deposited belonging to the signers of this escrow, four hundred ninety-nine thousand seven hundred (499,700) shares, or certificate No. 19, for five hundred and five thousand (505,000) shares.

(5) Within six months from said 1st day of April, 1903, the said George M. Nix or his assigns must pay thirty-seven and a half (37½%) per cent. of eighty-nine thousand, nine hundred forty-nine and sixty one-hundredths ($89,949.60) dollars, or thirty-three thousand and seven hundred thirty-one and ten one-hundredths ($33,731.10) dollars, and may then withdraw seven hundred forty-nine thousand and five hundred and fifty (749,550) shares of said stock, or certificate No. 20 for seven hundred fifty-seven thousand five hundred (757,500) shares deposited in escrow.

(6) Within one year from the said 1st day of April, 1903, said George M. Nix or his assigns, must pay thirty-seven and a half (37½%) per cent. of said eighty-nine thousand, nine hundred forty-nine and sixty one-hundredths ($89,-949.60) dollars, or thirty-three thousand seven hundred thirty-one and ten one-hundredths ($33,731.10) dollars, and may then withdraw the balance, to wit: Seven hundred forty-nine thousand, five hundred and fifty (749,550) shares of said stock so deposited in escrow, or the third certificate, No. 21, for seven hundred fifty-seven thousand, five hundred (757,500) shares of stock.

(7) It is understood that the extra one hundred twenty-one thousand one hundred and twenty (121,120) shares of stock deposited in escrow are the property of George M. Nix, the certificates having erroneously been made out for a larger amount of stock than the agreement with the signers of this escrow calls for, by reason of a mistake in the acreage of the ground.

(8) In case said George M. Nix or his assigns does not carry out the conditions of this escrow in reference to work to be done on said ground, as specified in the contract with said signers of the escrow, made on the 18th day of March, 1902, or payments provided for herein shall not be made, then all rights under this escrow shall cease and determine, and said parties depositing said stock may withdraw the same from said First National Bank of Deadwood, and shall be the owners thereof as shown by the schedule marked

'Exhibit A' hereto free of any option upon the same by the said George M. Nix, or his assigns.

(9) In case any payments shall be made by said George M. Nix or his assigns to the undersigned parties and the future payments provided for herein shall not be made, then all rights of said George M. Nix or his assigns to any future delivery of stock shall cease and the undersigned parties may withdraw said stock from said bank as above provided.

(10) Time is of the essence of this contract.

(11) All moneys deposited with said bank as above provided shall be paid over by the said bank to the several parties entitled thereto as shown by the schedule marked 'Exhibit A' hereto attached and made a part of this agreement.

(12) In case any of said payments shall not be made, the stock shall be delivered to the parties named in said Exhibit A and be the property of said parties; twenty shares of stock to be delivered for each dollar to be paid the said parties.

Dated Deadwood, South Dakota, this 16th day of January, 1903.

### Exhibit A.

Each payment as it shall be made shall be by said bank apportioned and paid over to the following named parties or deposited to the credit of said parties in the following amount to wit:

| Name of Persons to Whom Payments are to be Made. | 1st Payment Less 10%. | 2d Payment Less 10%. | 3d Payment Less 10%. | Total. |
|---|---|---|---|---|
| | $22,487 40 | $33,731 10 | $33,731 10 | |
| Susie B. Moore............. | $ 770 60 | $ 1,155 87 | $ 1,155 87 | $ 3,082 34 |
| Pat J. O'Brien............. | 770 60 | 1,155 87 | 1,155 87 | 3,082 34 |
| Thomas Burke ............. | 770 60 | 1,155 87 | 1,155 87 | 3,082 34 |
| James Cusick ............. | 7,419 95 | 11,129 94 | 11,129 95 | 29,679 84 |
| Thomas Christian ......... | 6,804 12 | 10,206 19 | 10,206 19 | 27,216 50 |
| B. F. Atkins.............. | 910 25 | 1,365 39 | 1,365 19 | 3,640 85 |
| Charles Hegberg ........... | 455 10 | 682 76 | 682 77 | 1,820 63 |
| Ed A. Dryer............... | 2,518 00 | 3,777 01 | 3,777 01 | 10,072 01 |
| Frank Abt ................ | 498 60 | 747 90 | 747 90 | 1,994 40 |
| R. H. Purcell............. | 498 60 | 747 90 | 747 90 | 1,994 40 |
| A. D. Wilson............. | 615 83 | 923 75 | 923 76 | 2,463 34 |
| Charles J. Swanstrom...... | 455 15 | 682 75 | 682 75 | 1,820 65 |
| George M. Nix............ | 2,498 60 | 3,747 81 | 3,747 77 | 9,994 18 |

The agreement was signed by the plaintiff and the other co-owners of the shares intended to be sold, but was not signed by Nix, the bank, or the mining company.

In this connection it may be observed that there are several mistakes in the agreement, which, though confusing at first, are obviated when the entire instrument is considered. The number of shares represented by the three certificates is inaccurately stated as 2,120,000, but is shown to have been actually 2,020,000. The number of shares owned by the plaintiff and his co-depositors is stated as 1,998,880 and also as 1,998,-800; the former being correct. Nix is spoken of as owning 121,120 shares, but the true number appears to have been 21,120. In Exhibit A, Nix is named as if he were one of those among whom the specific payments of $22,487.40, $33,731.10, and $33,731.10 provided for in paragraphs 4, 5, and 6 were to be divided; but a computation of the amounts there apportioned to the plaintiff and his co-depositors shows that the whole of these payments would be exhausted before reaching Nix's name. As these specific payments were unquestionably the net purchase price of the shares of the plaintiff and his co-depositors, after deducting the commission allowed to Nix by paragraph 3, and as the

last line of Exhibit A must be regarded as a mere statement of Nix's commission, the rule stated in paragraphs 8, 9, and 12 for measuring the interests of the plaintiff and his co-depositors in such of the stock as might not be sold is not well expressed, unless it was intended that Nix should have a commission or interest in such shares as he might fail to purchase, which is both improbable and contrary to the provisions of paragraphs 3, 8, and 9. It was doubtless meant that the plaintiff and his co-depositors should own 20 shares of the stock not sold for each dollar of the gross purchase price not paid or earned as a commission.

Pursuant to paragraph 4, Nix paid the first installment of $22,487.-40, being 25 per cent. of the gross purchase price, less a corresponding proportion of his commission, and withdrew from the bank certificate No. 19 for 505,000 shares. The time for paying the second installment was then extended to January 1, 1904, when Nix made default and so lost all rights to further avail himself of the option. Thereupon the plaintiff, acting independently of his co-depositors, made a demand of the bank, which, as interpreted by his counsel, called upon the bank to surrender the original certificates, Nos. 20 and 21, to the mining company, to cause new certificates to be issued in such manner as would permit the remaining shares to be divided among their owners according to their respective interests, and then to deliver to the plaintiff a separate certificate for his portion. The demand was not complied with; and, if the bank was obligated to thus divide the remaining shares among the several co-owners and to deliver to each a separate certificate for his portion, the circumstances surrounding the demand were such that the bank was guilty of a conversion of the plaintiff's portion, otherwise compliance with the demand was rightly refused, and there was no evidence of a conversion. As respects the mining company, there was an entire absence of evidence of any act of commission or omission on its part violative of or inconsistent with the rights of the plaintiff.

At the conclusion of the evidence, the court ruled that the terms of the agreement were not such as to obligate the bank, upon Nix's default, to divide the remaining shares among the several co-owners, and to deliver to each a separate certificate for his portion, but merely required it to return the original certificates, Nos. 20 and 21, to the plaintiff and his co-depositors, from whom they were received, and that the plaintiff, acting independently of his co-depositors, was not entitled to the possession of them. Under the court's instruction, the jury then returned a verdict for the defendants, and, judgment having been rendered thereon, the plaintiff sued out the present writ of error.

As Nix, who owned some of the shares represented by the certificates, assented to the terms of the agreement by accepting some of its benefits, and as the bank also assented thereto by accepting the duties of depositary thereunder, the decisive question presented for our consideration is: Did the agreement, rightly interpreted, require the bank, upon the default of Nix, to divide the shares represented by the two remaining certificates among the several co-owners according to their respective interests and to procure for and deliver to each a certificate representing his portion? If it did, it not only enjoined upon the de-

positary duties which were unusual, but also attached to its office responsibilities which were disproportionate to any advantages which could reasonably have been expected to accrue to it therefrom. There was no express arrangement for its compensation, and not only did paragraph 11 and Exhibit A expressly require it to promptly pay over to the plaintiff and his co-depositors "all moneys" received by it in payment for their stock, but paragraphs 4, 5, and 6 left it altogether uncertain whether any of the moneys would even pass through its hands, should Nix avail himself of his option to purchase. As is said by Schouler, in his work on Bailments ([3d Ed.] §§ 58, 63), "the courts are indisposed to extend, by inference, the perils of an unprofitable trust," and "every bailee without reward ought to be given the least trouble consistent with his actual undertaking." This is in keeping with the rule that, when a contract is fairly open to two constructions, it is legitimate to adopt the one which equity would favor. Washington, etc., Co. v. Coeur d'Alene, etc., Co., 160 U. S. 77, 101, 16 Sup. Ct. 239, 40 L. Ed. 355.

The circumstances surrounding the making of the agreement were these: The certificates had been issued in the name of Nix and had been by him assigned in blank. They were in the possession of the plaintiff and his co-depositors, who were giving Nix an option to purchase their shares. To protect each party against any intervening act of the other, as also for their mutual convenience, it was deemed proper to place the certificates in the custody of a depositary to abide the action of Nix under the option contract. The certificates were not formally assigned to the bank, and it was not even nominally made the owner of the shares. The original conditions therefore could be restored, if Nix made default, by a mere redelivery of the certificates to those from whom they were received. The bank was in no better position to divide the shares and obtain new certificates than were the owners. Indeed, its place of business was at Deadwood, S. D., and the mining company was a Colorado corporation, whose principal offices, including that for the transfer of stock, were presumably in the latter state. Thus the situation at the time suggests no reason why the bank should have been charged with dividing the shares and obtaining new certificates, in the event of Nix's default.

The language of the agreement is that of the plaintiff and his co-depositors, and, if there be any doubt as to its true meaning, it is both just and reasonable that it should be construed most strongly against them. Noonan v. Bradley, 9 Wall. (U. S.) 394, 407, 19 L. Ed. 757; Texas & Pacific Ry. Co. v. Reiss, 183 U. S. 621, 626, 22 Sup. Ct. 253, 46 L. Ed. 358; Osborne v. Stringham, 4 S. D. 593, 57 N. W. 776.

Of course, effect must be given to the intention of the parties, and, if that is made plain and certain by the agreement, every part of it being duly considered, the considerations and rules of interpretation to which we have referred are without application.

Turning to the agreement, we find that, in respect of moneys deposited with the bank in payment for the stock of the plaintiff and his co-depositors, it is directed with much particularity, in paragraph 11 and Exhibit A, that they shall be "by said bank apportioned"

among and paid over to the "several" parties entitled thereto; the amount to be paid to each being precisely stated. But, in respect of the disposition of the certificates to be made by the bank, in the event of Nix's default, it is said, in paragraph 8, "said parties depositing said stock may withdraw the same from said First National Bank of Deadwood, and shall be the owners thereof as shown by the schedule marked 'Exhibt A' hereto." And in paragraph 9.: "The undersigned parties may withdraw said stock from said bank as above provided." These paragraphs, it will be observed, do not charge the bank with the division of the shares among the several parties entitled to them, but plainly contemplate that it shall merely permit the depositors to withdraw what they deposited with it, the certificates. Thus a distinction is reasonably and clearly drawn between the moneys, which would be readily capable of division by the bank, and the certificates, which could not be divided without the assistance of the mining company, over which the bank had no control. And that it was intended that the bank should not be troubled with making any change in the certificates is further indicated by the fact that no provision was made for segregating the shares of Nix, named in paragraph 7, from the others during the life of his option, and also by paragraph 4, which authorized the bank to surrender certificate No. 19 for 505,000 shares upon the payment of the purchase price of 499,700 shares, and by paragraph 5, which authorized it to surrender certificate No. 20 for 757,-500 shares upon the payment of the purchase price of 749,550 shares. Without any doubt or uncertainty, the several paragraphs and provisions which we have mentioned, unless modified by another, contemplated that the bank should deliver to Nix or redeliver to the depositors, as the one or the other might become entitled thereto, the identical certificates deposited with it.

We are thus brought to paragraph 12, upon which the plaintiff chiefly relies, which reads:

"In case any of said payments shall not be made, the stock shall be delivered to the parties named in said Exhibit A and be the property of said parties; twenty shares of stock to be delivered for each dollar to be paid the said parties."

It is difficult to harmonize this paragraph with other provisions of the agreement. The parties named in Exhibit A are not identical with those authorized by paragraphs 8 and 9 to withdraw the stock from the bank, upon the default of Nix, for he is not one of the latter, and yet is named in Exhibit A. Again, while other paragraphs show unmistakably that he was not to have any right to any of the stock of the plaintiff and his co-depositors, save as he should pay for it, this paragraph, if given full effect as it is written, would entitle him, in the present situation, to 149,911.60, or possibly 149,916, shares of their stock without pay.

It is apparent, we think, that resort must be had to interpretation to remove the doubt and uncertainty cast upon the meaning of the agreement by this paragraph. While the reference to Exhibit A seemingly includes Nix among those to whom the stock was to be delivered, what follows equally indicates that he is not included, for

it says "twenty shares of stock to be delivered for each dollar to be paid the said parties." He had no interest in the stock to be sold and was not one of those to be paid. Although entitled to a commission of 10 per cent. on the gross purchase price, in the event and to the extent that he availed himself of the option to purchase, he was plainly not entitled to any commission or payment in respect of stock not sold. The reference to Exhibit A must therefore be understood as not including him, and therefore as directing a delivery to the other parties named in the exhibit, who are identical with those designated in paragraphs 8 and 9 as the "parties depositing the said stock" and "the undersigned parties." This view is also strengthened by the fact that the measure so prescribed for determining the interest of the depositors in the stock not sold—that is, 20 shares for each dollar to be paid—is the precise rate at which the gross purchase price was fixed, for by paragraphs 2 and 3 the depositors agreed to sell to Nix their 1,998,880 shares for $99,944.

Unlike the provisions relating to the disposition of moneys paid into the bank, this paragraph does not in terms direct an apportionment among the depositors, but only the delivery of the stock to "the parties named in said Exhibit A"—meaning the depositors. It does not say that the stock shall be delivered to them severally, or that 20 shares shall be delivered to each for each dollar to be paid to him, but simply refers to them in a collective way as do paragraphs 8 and 9. But, as there would necessarily be more than enough stock to fill the measure of 20 shares for each dollar to be paid to the depositors, and as the excess would necessarily be all or part of the 21,-120 shares owned by Nix as stated in paragraph 7, it is urged that it could not have been intended that his shares should be delivered to the depositors or become their property, and therefore that it must have been intended that the bank should divide the stock and procure for and deliver to the several owners new certificates representing the shares to which they would be respectively entitled. There is some color for the contention, but we think it is not sound. Of course, it was not intended that the depositors should become the owners of Nix's shares any more than that he should become the owner of 'theirs without pay; but it does not follow that the original certificates representing the shares of both were not to be redelivered to the depositors from whom they were received. He had assented to the inclusion of his shares in these certificates, had indorsed upon the latter an assignment in blank, and had intrusted them to the possession and keeping of the depositors before they were delivered by the latter to the bank. He also assented to the terms of the agreement, although it contained no provision for the delivery to him of his shares save as he might by making the prescribed payments become entitled to the original certificates. In these circumstances, it is quite reasonable to believe that he was content to look to the depositors, to whom alone the agreement directs a redelivery, for a segregation of his stock in the event that through his default the certificates should be returned to them. Had there been a purpose to impose upon the bank the unusual duty of dividing the stock and procuring for and delivering

to the several owners new certificates for the shares to which they would be respectively entitled, it doubtless would have been plainly stated; but, as such an intention is not expressed, or even necessarily implied, we think the considerations and rules of interpretation before mentioned require that whatever doubt or uncertainty may exist in that regard should be resolved in favor of the bank, and that it must be held that no such duty was imposed.

Our conclusion is that the plaintiff was not entitled to demand that the bank divide the remaining stock among the several co-owners, or that it deliver to him alone the remaining certificates, and that therefore no conversion was shown, and a verdict against him was rightly directed.

The judgment is accordingly affirmed.