COLONIALGROSSISTERNES FORENING v. MOORE–McCORMACK LINES, Inc.

No. 69, Docket 21435.

United States Court of Appeals. Second Circuit.

Argued Nov. 9, 1949.

Decided Dec. 12, 1949.

Haight, Deming, Gardner, Poor & Havens, New York City, for libellant-appellant; Thomas K. Roche, New York City, advocate.

Wood, Molloy, France & Tully, New York City, for respondent-appellee; Mel-

ville J. France and Henry P. Molloy, Jr., New York City, advocates.

Before AUGUSTUS N. HAND, CHASE and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

In March, 1940, there were shipped on board the vessel of the respondent Moore-McCormack Lines, Inc., 1,000 barrels of American cane syrup, 900 of which were consigned to the libellant for delivery to it at Bergen, Norway, and 100 for delivery to it at Trondheim, Norway. Full freight for both shipments was paid in advance to the respondent which issued bills of lading for them. The vessel left New York, the port of shipment, on March 10, 1940, and on March 27, arrived at Bergen. She docked on March 29, and commenced discharging cargo. Before she had reached libellant's cargo, which was in the hold, the Germans invaded Norway and on April 9, occupied Bergen, and ordered the vessel to leave the dock and proceed to an anchorage. The guard was soon withdrawn, but the vessel's movements were subject to German naval control. Allied aerial counter-attacks on German naval and ground forces at Bergen followed and, on April 12, the ship was machine-gunned. On April 15, she anchored at a pier in Bergen Harbor, and the American Consul ordered the ship's officers and crew ashore for their protection. The master had no crew, officers, stevedores, or steam by means of which to discharge libellant's cargo. Another consignee had certain bulk oil cargo aboard which was discharged by means of its own shore-gang, pipe-lines, and pumps. The libellant made no attempt to discharge its cargo personally and its agents, who came on board on several occasions, found no one in authority, no personnel, and no steam. Accordingly, neither of the shipments was discharged in Norway, and on April 23 the vessel left Bergen for New York with libellant's merchandise still on board. On reaching New York, respondent placed the shipments in a warehouse and refused to deliver them to the libellant unless an additional sum of $3,919.39 was paid. This amount was equal to one-half the freight for the outward voyage and is agreed to have been a fair charge, if any had been permissible, for carrying back the cargo to New York. In order to obtain possession of the shipments, libellant paid, under protest, the charges demanded, and thereafter filed this libel to recover them.

Clause 4 of the bills of lading sets forth the permissible excuses for non-delivery at the port of discharge, and various rights of the vessel in such a situation as developed at the Norwegian ports in the case at bar. We append in the margin Clause 4 in the form appearing on pages 6 and 7 of the appellant's brief.[1]

1. "4. In any situation whatsoever or wheresoever occurring and whether existing or anticipated before commencement of or during the voyage, which in the judgment of the carrier or master is likely to give rise to capture, seizure, detention, damage, delay or disadvantage to or loss, of the ship or any part of her cargo, or to make it unsafe, imprudent, or unlawful for any reason to begin or continue the voyage or to enter or discharge the goods at the port of discharge, or to give rise to delay or difficulty in arriving, discharging at or leaving the port of discharge or the usual place of discharge in such port,

"[1] the master, whether or not proceeding toward or entering or attempting to enter the port of discharge or reaching or attempting to reach the usual place of discharge therein or attempting to discharge the goods there, may, without giving any prior notice, discharge the goods into depot, lazaretto, craft or other place and the goods shall be liable for any extra expenses thereby incurred;

"[2] or the master may proceed or return, directly or indirectly, to or stop at such other port or place whatsoever as he or the carrier may consider safe or advisable under the circumstances and discharge the goods or any part thereof there without giving any prior notice and, when landed as hereinabove provided, the goods shall be at their own risk and expense, the delivery thereof by the carrier shall be considered complete and the carrier shall be freed from any further responsibility in respect thereof except to mail notice of the disposition of the goods directed to the shipper or consignee named in this bill of lading at such address as may be stated herein;

After two German warships had anchored in Bergen harbor on April 9, 1940, the commander of the German squadron instructed the master to leave the dock where the ship had been unloading. Between April 9 and April 15 there were air raids by allied planes, and on April 15 the American Counsul gave orders to remove all officers and crew on account of the dangerous position of the vessel. Appellant's brief concedes that "when the Germans invaded Norway and occupied the Port of Bergen on April 9th, a situation arose in which the master of the 'Flying Fish' was entitled to and did adopt the third alternative permitted by Clause 4 [of] retaining Colonial's cargo on board until the return trip or until such time as he or the carrier [thinks] advisable." Both the ship and cargo were in danger and the alternative adopted by the master of carrying the cargo out of the danger zone and back to New York were within a sound discretion which was reasonably exercised. It is plain that the master was justified in retaining the cargo on board until such time as he thought advisable. Under the concluding sentence of Clause 4, the carrier was entitled to a "reasonable extra compensation" for "any services rendered to the goods as hereinabove provided." The question before us is whether keeping the goods on board and returning them to New York in respondent's vessel was a "service rendered to the goods" within the meaning of the bill of lading. It is argued that under alternatives 1, 2 and 4 of Clause 4 of the bill of lading the compensation provided for related only to "expenses" incurred in respect to the goods and not to "services." But alternative 4 is followed by the general clause providing extra compensation for services rendered to the goods under any of the alternatives. In retaining the goods and carrying them back to New York, the vessel was obliged to safeguard them in every reasonable way and to act as a prudent bailee in protecting and caring for the merchandise. In the circumstances, we can see no reason why a return of the goods by the carrier was not a service within the description of "services rendered to the goods" and just as compensable as would have been payments for forwarding them by some other carrier.

The decisions in Brown v. Gaudet (Cargo ex Argos), (1873), L.R., 5 P.C. 134, and Gillespie Bros. Proprietary, Ltd. v. Burns Philp & Co. (Supreme Court, New South Wales, 1946), 79 Lloyds List Law Reports 393, in which the master of the vessel was given no such discretion in respect to the disposition of the cargo as in the bill of lading we are dealing with, do not seem pertinent to the case before us.

For the foregoing reasons, the decree is affirmed.

CHASE, Circuit Judge (dissenting).

If the bill of lading ought to be construed to entitle the carrier to reasonable extra compensation for any action rightfully taken, because permitted, under the third alternative in clause four, my brothers are right, but I cannot believe such a construction permissible. Wherever there is a fair doubt as to the meaning of a bill of lading, it should be construed most strongly against the carrier which prepared it. Texas & Pacific Ry. Co. v. Reiss, 183 U.S. 621, 626, 22 S.Ct. 253, 46 L.Ed. 358. This bill did not provide for extra compensation to the carrier for any action taken under the clauses excusing non-delivery to the consignee at the point of delivery, but only for "any services rendered to the goods as hereinabove provided." Some of the permitted acts in lieu of direct carriage by the vessel to destination and delivery there were efforts which might be taken to deliver the goods otherwise and for such services extra compensation was provided. But where the carrier, as here, did nothing but let the goods remain aboard, though that was ex-

"[3] or the master may retain the cargo on board until the return trip or until such time as he or the carrier thinks advisable;

"[4] or the master may forward the goods by any means by water or by land or by both such means, at the risk and expense of the goods.

"For any services rendered to the goods as hereinabove provided, the carrier shall be entitled to a reasonable extra compensation." (Spacing and brackets supplied.)

cused by the bill of lading, it cannot be said that a service was rendered to the goods.

Though it is by no means clear that the vessel could not have discharged the goods at Bergen where the consignee was ready, willing and able to take delivery, I will assume that it could not. Then it could have elected to try to make delivery in some other way and for that extra compensation would have been earned. Or it could have let the goods remain in the hold, as it did. Of course it could not abandon them and upon failure to make delivery, or of any effort toward that, it had no alternative but to take them wherever the ship went. That is all it did and, in so doing, it performed no service to the goods by way of carriage to destination or by way of any effort to do so. All that happened to the goods was merely an incident in the return of the ship for its own purposes to the point of departure. Insofar as that included custodial care, the carrier was compensated by the original freight paid.

I dissent.