Elias SIEGELMAN, individually, and as Administrator of the Estate of Eva Siegelman, deceased, Plaintiff-Appellant,

v.

CUNARD WHITE STAR Limited, Defendant-Appellee.

No. 14, Docket 23054.

United States Court of Appeals, Second Circuit.

Argued Nov. 9, 1954.

Decided Feb. 17, 1955.

David Fox, New York City, for appellant.

Lord, Day & Lord, William J. Brennan, New York City, for appellee.

Before CLARK, Chief Judge, and FRANK and HARLAN, Circuit Judges.

HARLAN, Circuit Judge.

Plaintiff, in his own right and as administrator of his wife's estate, brings this action to recover for injuries suffered by his wife on the defendant's vessel, the R.M.S. Queen Elizabeth. The action was begun in a New York state court on December 14, 1951, and removed on diversity grounds to the federal district court for the Southern District of New York on January 3, 1952, the requisite jurisdictional amount being present.

On September 9, 1949, the Compass Travel Bureau, Inc., Cunard's New York agent, issued to Mr. and Mrs. Elias Siegelman a document describing itself as a "Contract Ticket." It was a large sheet of light green paper, about 13 inches long and 11 inches wide. On the back were certain notices to passengers,

relating to baggage, time of collection of ticket, location of the company's piers and offices, etc. On the front was printed in black Cunard's promise to provide specified transportation, in this case from New York to Cherbourg, subject to certain exceptions, and to 22 "terms and conditions," also printed in black. Printed in red in heavier type was a notice directing the attention of passengers to these "terms and conditions." Also printed in red, and in capital letters, was a statement that "it is mutually agreed that this contract ticket is issued by the Company and accepted by the passenger on the following terms and conditions." The paper also contained a space where the departure time, the names of the passengers and of the ship, and other data were typed in. The paper was stated to be non-transferable. In a space provided for the signature of the company, the name of the Compass Travel Bureau was typed. The paper was not signed by either of the passengers.

On September 24, 1949, when the Queen Elizabeth had been at sea four days, Mrs. Siegelman was injured. While she was seated in a dining room chair, she and the chair were overthrown. Her chair was alleged to be the only one in the dining room which was not bolted to the floor. Upon returning to New York, the Siegelmans retained an attorney to prosecute their claim against Cunard. On August 31, 1950, after Cunard's doctor had examined Mrs. Siegelman, Cunard offered $800, the approximate amount of medical expenses stated to have been incurred by the plaintiff and his wife, in settlement of the claim. This offer was made to the Siegelmans' lawyer over the telephone by Swaine, a claim agent of Cunard. Noticing that the ticket required suits for bodily injury to be brought within a year of the injury, and that the injury had occurred barely less than a year ago, the lawyer asked Swaine whether it would be necessary to begin suit in order to protect his clients' rights. Swaine is said to have stated that no suit was necessary, that the filing of an action would be futile in view of the prospect of early settlement, and that Cunard's offer would stand open.

Subsequently Mrs. Siegelman died. Then, on January 4, 1951, Cunard withdrew its offer, which had not yet been accepted, stating that it could not be tendered to any one other than the injured party.

On December 14, 1951, this suit was begun, claiming on behalf of the deceased damages for pain and medical expenses, and on behalf of her husband, damages for other medical expenses and for loss of consort. Cunard denied legal responsibility for the accident, and set up as a further defense the plaintiff's failure to bring the action within a year of the date the injury was suffered.

In January, 1953, the defendant moved to dismiss the action on the latter ground. Treating the motion as one for summary judgment, and having received affidavits from the attorneys and from the plaintiff, the court found the issues for the defendant, and dismissed the complaint.

On this appeal appellant asserts that Cunard is barred from using the period of limitation as a defense, because of Swaine's statement that suit was unnecessary. The provisions of the "Contract Ticket" relevant to the appeal are as follows:

"10. * * * No suit, action or proceeding against the Company or the ship, or the Agents of either, shall be maintainable for loss of life of or bodily injury to any passenger unless * * * (b) * * * the suit, action or proceeding is commenced within one year from the day when the death or injury occurred.

"11. The price of passage hereunder has been fixed partly with reference to the liability assumed by the Company as defined by this contract, and no agreement, alteration or amendment creating any other or

different liability shall be valid unless made in writing and signed for the Company by its Chief Agent at the port of embarkation.

"20. All questions arising on this contract ticket shall be decided according to English Law with reference to which this contract is made."

Before reaching the merits of the plaintiff's claim, we must deal with a number of preliminary questions: (1) Are federal or state choice-of-law rules to be applied here? (2) What is the applicable choice-of-law rule of the proper authority? (3) If the applicable choice-of-law rule points to the use of English law, what difference is made by the facts that English law was not pleaded or proved below, and that the plaintiff made no attempt to supply affidavits of experts on English law, after the trial Judge had offered him an opportunity to do so?

### I.

This case involves a claim based on a tort, committed on the high seas, and a defense based on a contract made in New York, to be performed there, on the high seas, and abroad. Our first question, though, is not what law governs the issues involved, but rather what law, federal or New York, controls the choice of the governing law. This is not a question of choice of laws, properly speaking, but rather a question of the division of competence between federal and state authority.

The Constitution, Article III, Section 2, extended the federal judicial power "to all Cases of admiralty and maritime Jurisdiction." In implementing this provision in the Judiciary Act of 1789, Congress provided that litigants might also take advantage of their common-law remedies, and this provision was interpreted to permit suits on maritime causes in state as well as federal courts. See discussion in Chelentis v. Luckenbach S. S. Co., 1918, 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171. From an early time, therefore, maritime litigation has been carried on in both systems of courts. And the law applied has been both state and federal; for example, state wrongful death acts have been applied in federal courts. See Levinson v. Deupree, 1953, 345 U.S. 648, 73 S.Ct. 914, 97 L.Ed. 1319, and the Jones Act, 46 U.S.C.A. § 688, extending the benefits of the Federal Employers' Liability Act to maritime workers, has been applied in state courts, see Garrett v. Moore-McCormack Co., Inc., 1942, 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239. Under these circumstances it is not always easy to ascertain whether federal or state law governs particular issues.

In cases where federal jurisdiction is based solely on diversity of citizenship, the doctrine of Erie R. R. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, requires the application by the federal court of substantially the same law as would be applied by the courts of the state in which the federal court is held. If this case were governed by Erie, we would be required to apply New York's choice-of-law rules. Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. But suits brought in admiralty are not governed by Erie. Levinson v. Deupree, supra. And even though this case was not begun in the federal admiralty court, Erie does not require the federal court to handle the case in substantially the same fashion as a state court would. Jansson v. Swedish-American Line, 1 Cir., 1950, 185 F.2d 212, 30 A.L.R.2d 1385. That is not to say, however, that state and federal courts may always apply different substantive law in maritime cases. On the contrary, where the cause of action is created by a state statute the federal court must presumably follow the state court's interpretation of it with regard to substantive matters, see Levinson v. Deupree, supra, assuming, of course, that the state-created right may be received into admiralty under the doctrine set out in Southern Pacific Co. v. Jensen, 1917, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed.

1086, and its successors. The same substantive law must also be applied by federal and state courts in cases governed by federal statutes, see Garrett v. Moore-McCormack Co., Inc., supra. It has also been said that the same substantive law applies to common law actions whether brought in federal or state courts, Jansson v. Swedish-American Line, supra; and a long list of authorities is cited for this proposition, although Mr. Justice Frankfurter, in Caldarola v. Eckert, 1947, 332 U.S. 155, 67 S.Ct. 1569, 91 L.Ed. 1968, may have left that issue in doubt. Cf., however, the majority and concurring opinions in Pope and Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143.

Under the circumstances, we consider that we are not bound to apply New York's choice-of-law rules. Erie and Klaxon do not compel us to. And this is not a case, like Levinson v. Deupree, supra, where the federal court is considering a claim based on a state-created right. Even if it were, it is possible that the federal court would not be bound by the state's choice-of-law rule, unless the rule limited the scope of the right. Instead, the claim here is for a tort committed on the high seas, and the federal choice-of-law rule might well be binding on the state courts, if either rule is to be binding in both sets of courts.

In Jansson v. Swedish American Line, supra, a suit brought originally on the civil side of the federal court but also involving a maritime tort, the court applied the federal choice-of-law rule. It is true that in that case there was no defense, as there is here, based on a contract made in one of the United States, but we do not think that should change the result. That might be a ground for judging the claim and the defense by different laws. But as far as choice-of-law rules are concerned, either the forum's rule should be applied automatically, or as Jansson suggests, the nature of the claim should govern which rule controls. Under both of these approaches, the federal choice-of-law rule applies here.

## II.

Our next question is: under the federal choice-of-law rule, what law governs the issues here? We are not concerned with the law applicable to the accident. Instead we must decide what law applies to the validity and interpretation of certain provisions of the "Contract Ticket," and to the effect of Swaine's conduct upon Cunard's right to resort to the one-year limitation period in the contract.

The ticket stipulated that "All questions arising on this contract ticket shall be decided according to English Law with reference to which this contract is made." Considering, as we do, the ticket to be a contract—see Foster v. Cunard White Star, 2 Cir., 1941, 121 F.2d 12—the provision that English law should govern must be taken to represent the intention of both parties. Therefore, this provision, if effective under the federal choice-of-law rule, renders English law applicable here, even though, absent the provision, some other law would govern under the applicable federal conflicts rule. See Liverpool & Great Western Steam Co. v. Phenix Ins. Co., 1889, 129 U.S. 397, 9 S.Ct. 469, 478, 32 L.Ed. 788, in which the Supreme Court said: "* * * the general rule that the nature, the obligation, and the interpretation of a contract are to be governed by the law of the place where it is made, unless the parties at the time of making it have some other law in view, requires a contract of affreightment, made in one country between citizens or residents thereof, and the performance of which begins there, to be governed by the law of that country * * *".

Liverpool also indicates that there may be an exception to this rule where a contract stipulates another law, but the scope of this exception is not clear. Thus, since we cannot assume that the parties' choice of law will always foreclose the court from applying another law, our question is whether the contract provision here should have the effect, under federal conflicts rules, of making the

English law applicable to the particular questions posed by this case. While this question may appear on the surface to be purely one of conflict of laws, we think it also involves interpretation of the contract. For it is not altogether free from doubt what is meant by the stipulation that "All questions arising on this contract ticket shall be decided according to English Law * * *." See 40 Col.L.Rev. 518, 522–23 (1940), criticizing one interpretation of a similar provision.

Our issue, then, involves two lines of inquiry: (1) What questions did the parties intend to be controlled by English law? and (2) Will the federal conflicts rule give effect to their intention? In pursuing the first inquiry, we must examine more closely the provision of the ticket quoted above.

■■ Three questions as to the scope of this provision arise under its language. *First,* are questions to be decided by the "whole" English law, including its conflicts rules, or just by the substantive English law? That is, are questions to be decided according to the law of England, or instead, as an English court might decide them, applying where appropriate the law of some other country? We think the provision must be read as referring to the substantive law alone, for surely the major purpose of including the provision in the ticket was to assure Cunard of a uniform result in any litigation no matter where the ticket was issued or where the litigation arose, and this result might not obtain if the "whole" law of England were referred to. *Second,* does the provision intend that questions of validity of the contract and its provisions, as well as questions of interpretation, are to be governed by English law? The language of the clause, covering "all questions," indicates that validity as well as interpretation is embraced. *Third,* is the recital meant to require the application of English law to the question of what conduct may amount to a waiver of its provisions? Although the wording of the clause—relating to questions arising "on" the contract—may indicate that such a question was not meant to be covered, it appears unnatural to hold that all questions of validity and interpretation were intended to be governed by English law but that this question was not. We therefore consider that the question of what conduct was sufficient to operate as a waiver of the ticket's provisions was also meant to be determined by English law.

We now come to the inquiry as to the extent to which this provision, so construed, is to be given effect in deciding the particular issues before us. Those issues are: (1) Is the one-year limitation period provided in the contract for the bringing of suits valid? (2) Does Swaine's conduct prevent Cunard from using the period as a defense? and (3) *How is this matter affected by the clause* requiring alterations of the contract to be in writing? It appears not to be contested that the ticket should be treated as a contract and that failure to bring the action within the contract limitation period would be a defense under English law—see Jones v. Oceanic Steam Navigation Co., [1924] 2 K.B. 730, but since the same result would follow under American law—see 46 U.S.C.A. § 183(b); Scheibel v. Agwilines, Inc., 2 Cir., 1946, 156 F.2d 636—we need not decide whether English law is applicable to the first of these issues. As to the second and third issues—where English and American law may differ—in the view which we take of the case, we need really only deal with applicability of English law to the second issue—viz., whether Swaine's conduct prevents Cunard from using the one-year limitations provision as a defense—although in light of what we say below we think that English law would clearly control the third issue —viz., the effect of the "alterations" clause.

As we have said, we construe the contract as establishing the intention of the parties that English law should govern both the interpretation and validity of

its terms. And we think it clear that the federal conflicts rule will give effect to the parties' intention that English law is to be applied to the *interpretation* of the contract. Stipulating the governing law for this purpose is much like stipulating that words of the contract have the meanings given in a particular dictionary. See Cheatham, Goodrich, Griswold, & Reese, Cases on Conflict of Laws 461 (1951). On the other hand, there is much doubt that parties can stipulate the law by which the *validity* of their contract is to be judged. Beale, Conflict of Laws § 332.2 (1935). To permit parties to stipulate the law which should govern the validity of their agreement would afford them an artificial device for avoiding the policies of the state which would otherwise regulate the permissibility of their agreement. It may also be said that to give effect to the parties' stipulation would permit them to do a legislative act, for they rather than the governing law would be making their agreement into an enforceable obligation. And it may be further argued that since courts have not always been ready to give effect to the parties' stipulation, no real uniformity is achieved by following their wishes. See Beale, op. cit. supra, at page 1085.

Here, of course, the question is neither one of interpretation nor one of validity, but instead involves the circumstances under which parties may be said to have partially rescinded their agreements or to be barred from enforcing them. The question is, however, more closely akin to a question of validity. Nevertheless, we see no harm in letting the parties' intention control. See Hal Roach Studios, Inc., v. Film Classics, 2 Cir., 1946, 156 F.2d 596, 598; Duskin v. Pennsylvania-Central Airlines Corp., 6 Cir., 1948, 167 F.2d 727, 729–730; Note, Commercial Security and Uniformity through Express Stipulations in Contracts as to Governing Law, 62 Harv.L.Rev. 647 (1949). Instead of viewing the parties as usurping the legislative function, it seems more realistic to regard them as relieving the courts of the problem of resolving a question of conflict of laws. Their course might be expected to reduce litigation, and is to be commended as much as good draftsmanship which relieves courts of problems of resolving ambiguities. To say that there may be no reduction in litigation because courts may not honor the provision is to reason backwards. A tendency toward certainty in commercial transactions should be encouraged by the courts. Furthermore, in England, where much of the litigation on these contracts might be expected to arise, the parties' stipulation would probably be respected. Vita Food Products, Inc. v. Unus Shipping Co., Ltd., [1939] A.C. 277 (P.C.) (similar provision in bill of lading given effect; construed, however, as referring to England's whole law, including its conflicts rules).

Where the law of the parties' intention has been permitted to govern the validity of contracts, it has often been said (1) that the choice of law must be *bona fide,* and (2) that the law chosen must be that of a jurisdiction having some relation to the agreement, generally either the place of making or the place of performance. The second of these conditions is obviously satisfied here. The fact that a conflicts question is presented in the absence of a stipulation is some indication that the first condition is also satisfied. Furthermore, there does not appear to be an attempt here to evade American policy. We have no statute indicating a policy contrary to England's on this subject. Cf. New York Life Insurance Co. v. Cravens, 1900, 178 U.S. 389, 20 S.Ct. 962, 44 L.Ed. 1116. And there is no suggestion that English law is oppressive to passengers. We regard the primary purpose of making English law govern here as being not to substitute English for American policies, but rather on the one hand, to achieve uniformity of result, which is often hailed as the chief objective of the conflict of laws, and on the other hand, to simplify administration of the contracts in question. Cunard's employees need be trained in only one set of legal rules.

This is not to suggest that English and American policies on this subject are identical. Any difference in law reflects some difference in policy. Consequently, to the extent English and American policies may differ on this question, we would consider that the parties may choose to have the English policies apply. But we express no opinion on what result would follow if we had stronger policies at stake, or if the parties had attempted a feined rather than a genuine solution of the conflicts problem.

### III.

We must next decide whether it is within our competence to apply English law, which was neither pleaded nor proved below.

Pleading the foreign law was clearly unnecessary. The Federal Rules of Civil Procedure, 28 U.S.C.A., apply here. Under Rule 8, a pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief. It is not necessary to set out the legal theory on which the claim is based. See Gins v. Mauser Plumbing Supply Co., Inc., 2 Cir., 1945, 148 F.2d 974.

Whether we are at liberty to interpret and apply foreign law which has not been proved below is a more difficult question.

When sources of foreign law were not readily accessible, it was impractical to expect a judge to ascertain applicable foreign law, as might be expected of him with regard to the law of his state. It is most likely that for this reason courts in this country came to require foreign law to be proved as a fact if it was to be applied. Otherwise a presumption as to the applicability of local common law, sometimes as modified by statute, would be followed. See Hartwig, Congressional Enactment of Uniform Judicial Notice Act, 40 Mich.L. Rev. 174, 176–78 (1941). Because of the increasing availability of the statutory and judge-made law of jurisdictions within the United States, many states now have statutes, such as the Uniform Judicial Notice of Foreign Law Act, requiring that law to be judicially noticed. See 42 Mich.L.Rev. 517 n. 65 (1943). Furthermore, while the difficulty of ascertaining foreign law might have been a reason for empowering a judge to disregard that law if not proven, it was hardly cause for requiring him to disregard it. Consequently, some statutes permit judges to apply unproven foreign law, even though it is not readily accessible. See Callahan and Ferguson, Evidence and the New Federal Rules of Civil Procedure, 47 Yale L.J. 194, 210–13 (1937). Under such statutes a judge may, but need not, require foreign law to be proved in the usual way. The New York statute, Civil Practice Act § 344–a, is of this latter type.

Rule 43(a) of the Federal Rules of Civil Procedure permits the presentation of evidence according to the most convenient method prescribed in (1) the statutes of the United States, (2) the rules of evidence formerly applied in suits in equity by federal courts, or (3) the rules of evidence applied in the courts of general jurisdiction of the state in which the federal court is held. It may be argued, of course, that Rule 43(a) is not intended to touch the question whether it is necessary to introduce evidence of foreign law in the first place, but deals only with the manner of presenting it. Nevertheless, it seems to us, as to Professor Moore, Moore's Federal Practice, § 43.09, that under the Rule, the New York judicial notice procedures, if most liberal, should apply. The most convenient method of presenting the foreign law is obviously not to have to introduce evidence on it at all, but simply to treat it in the same fashion as domestic law. Consequently, since a New York judge could consider and apply unproven foreign law, a federal district judge sitting in New York may do likewise. To this extent the Liverpool case, 1889, 129 U.S. 397, 9 S.Ct. 469, 32 L.Ed. 788, and the authorities cited therein, are out of date. Contrary statements made in cases not governed by

the Federal Rules, such as Black Diamond S. S. Corp. v. Robert Stewart & Sons, 1949, 336 U.S. 386, 396–397, 69 S.Ct. 622, 93 L.Ed. 754, and U. S. ex rel. Jelic v. District Director of Immigration, 2 Cir., 1939, 106 F.2d 14, are of course irrelevant.

The District Judge in this case appears to have exercised both his options under the New York law. He took notice of the English law and stated what he believed it to be. He also offered the parties an opportunity to submit affidavits of experts on English law, if it was thought that his understanding was incorrect. So far as appears, no affidavits were submitted.

■ On this state of the record, it might be argued that the plaintiff is bound by the Judge's understanding of the foreign law. But legal claims not presented below can normally be presented on appeal, unless waived or disclaimed. And in a situation such as this, where the plaintiff contests the applicability of the English law, we would not think that if this contention fails, his entire suit must also fail if not sustained by the trial Judge's understanding of the English law. It is at least within our discretion to consider whether the English law as we understand it supports the plaintiff's position.

### IV.

Finally we come to the substantive question whether Swaine's conduct prevents Cunard from successfully invoking the contractual limitation period as a defense.

Upon argument of the motion to dismiss the complaint as untimely, the plaintiff submitted affidavits opposing the motion. One of these was an affidavit of the lawyer retained by the Siegelmans to press their claim against Cunard. The lawyer described the circumstances of Cunard's offer of settlement:

"I had made a demand for $5,000 to settle these claims and Mr. Swaine advised me that he would have to take the matter up with his committee. Thereafter on August 31, 1950, three weeks before the limitation on the commencement of action expired, Mr. Swaine countered with an offer of $800.00.

"In that conversation Mr. Swaine told me that such offer was predicated to cover plaintiffs' special damages but from the tenor of the conversation, it appeared to me that such offer might be somewhat increased.

"I told Mr. Swaine that I would communicate this offer to my clients and that I would thereafter call him to advise him of their wishes in the matter. However, I told him that it might take sometime for my clients to consider such offer in view of the fact that at this time my clients were living apart. Mr. Swaine replied that there was no rush on the offer because it would stand open on the file and that the defendant believed our special damages should be paid as a matter of good will.

"Since the time to commence this action was going to expire three weeks later, on September 24, 1950, I told Mr. Swaine it appeared that I would have to commence my action in order to protect my clients' interests. Mr. Swaine answered that said suit was not necessary and that there was no point to commencing an action at this time since it appeared to both of us that there was an excellent chance of settling the matter."

■ On the basis of these assertions, which were uncontroverted, the plaintiff sought to establish either waiver of the limitation or that the defendants were estopped from relying upon it. The trial Judge appears to have held that the plaintiff was not entitled to assume that Swaine was authorized to waive the limitation, and held for the defendant.

At this state of the proceedings, though, we think that the Judge should

have assumed that Swaine's acts bound the defendant. If Swaine had actually or impliedly been authorized to waive periods of limitation, and had done so, then the defendant could hardly rely on the contractual limitation. The scope of Swaine's authority was a fact which the plaintiff might have established on trial. It was material, and could not properly have been presumed to be undisputed. Therefore, this question should not have been resolved against the losing party on summary judgment.

If we assume, however, that Swaine was authorized to speak as he did, it does not follow that the plaintiff should prevail. For taking the facts as he has stated them, he has not established waiver or estoppel under English law.

█ It appears true that in England a promise, supported by consideration, not to plead the statute of limitations is a sufficient answer to a defense based on the statute. 20 Halsbury's Laws of England, Limitation of Actions § 803 (2d Ed. 1936). And if there were a promise here, the plaintiff's forbearance from suit within the limitations period might be good consideration. But it is not possible to treat the statements said to have been made by Swaine as a promise. The most reasonable interpretation of his remarks is that because of the excellent chances of settlement, filing suit would turn out to be wasted effort. Under this view of the matter, Swaine's statement cannot be regarded as even a statement that Cunard intended not to plead the limitations period as a defense in the event that efforts at settlement proved unfruitful. But even if his statements could be regarded as a statement of what Cunard's intention was at that time, and if it could be shown that Cunard's intention then was otherwise, still there would seem to be no right to recovery. For in Yorkshire Insurance Co. v. Craine, [1922] 2 A.C. 541 (P.C.), the Judicial Committee of the Privy Council stated that in order to raise an estoppel by representation, the authorities required a misrepresentation of *fact*, and a misrepresentation of intention would not suffice, in spite of the frequently-quoted statement that the state of a man's mind is as much a fact as the state of his digestion.

█ Furthermore, even if Swaine's conduct were held to suspend the running of the limitations period, we do not think that under English law, the running of the period would never resume. At the time of the statements in issue, about three weeks remained in the one-year period. After the withdrawal of Cunard's offer on January 4, 1951, it could no longer be thought that Cunard would not use the defense of untimeliness to any action thereafter brought. Even if the limitations period was tolled, therefore, while the offer was outstanding, this lawsuit should have been commenced within three weeks of the receipt of the January 4 letter. The situation is analogous to that obtaining in fraud cases, where the English rule is that the period of limitations is neither suspended altogether nor begins at the time the fraudulent acts were committed, but begins instead at the time fraud is discovered or could be discovered with reasonable diligence. § 26, Limitation Act, 1939, 2 & 3 Geo. 6, c. 21.

█ The plaintiff states that he was delayed for six months in obtaining letters of administration. But this delay apparently would not toll the statute of limitations under English law. 20 Halsbury's Laws of England, Limitation of Actions §§ 782, 821 (2d Ed. 1936, and Supp. 1953). Again, though, even if the running of the period were suspended, this lawsuit was begun too late, for letters of administration appear to have been granted on June 7, 1951, and this action was not commenced until December 14, 1951.

On this view of the case it is not necessary to decide the effect English law would give to the provision requiring all alterations to the contract to be in writing and over the signature of Cunard's chief agent at the port of embarkation.

Affirmed.

FRANK, Circuit Judge (dissenting).

This case presents an important question relative to the rights of American passengers travelling from American ports on English vessels. Here a ticket, covering a voyage from New York to Cherbourg, was purchased by an American in New York. (As I think its very form and appearance important, I have attached a facsimile of the ticket as an Appendix to this opinion.) The injury to the passenger occurred on the high seas on September 24, 1949. This suit was brought on December 14, 1951. The statute of limitations had not then run. But the district court granted a summary judgment, dismissing the suit, on the ground that clause 10 of the passenger's ticket provided that no suit should be commenced except within one year. The plaintiff's undisputed affidavit showed that, in New York, on August 31, 1949, about three weeks before the year expired, defendant's claim agent, in connection with an offer of settlement made by him to the passenger, told the latter's lawyer that it would not be necessary to file suit within the year.[1] On January 4, 1951, after the year had elapsed, defendant withdrew the settlement offer.

1. The first question is as to the legal effect of the claim agent's conduct as a waiver or estoppel with reference to the one-year period of limitations contained in clause 10. As the ticket was a contract made in New York, it may be that this question is to be solved by reference to New York "law."[2] On the other hand, as it was to be primarily performed on the high seas, it may be that "maritime law" governs. Since, however, there appear to be no decisions concerning "maritime law" on this subject, I think we may assume that pertinent federal decisions, dealing with cases of intra-mural waiver or estoppel, will tell us the "maritime law." (It is to be noted that my colleagues, who apply "English law" do not cite English decisions relative to "maritime law.")

Disregarding for the moment clause 20 of the ticket (referring to "English law"), I think it clear that, under federal and New York decisions, the defendant waived (or is estopped to assert) the one-year provision (clause 10) and thereby completely abandoned it.

I begin with Semmes v. Hartford Ins. Co., 13 Wall. 158, 20 L.Ed. 490. There an insurance contract contained a provision barring suit after twelve months. Because of war, the insured could not bring suit until after that period. The Court, rejecting the argument that this contractual limitation was merely suspended and not wholly avoided, said: "[W]e are of opinion that the period of twelve months which the contract allowed the plaintiff for bringing his suit does not open and expand itself so as to receive within it three or four years of legal disability created by the war and then close together at each end of that period so as to complete itself, as though the war had never occurred. It is true that, in regard to the limitation imposed by statute, this court has held that the time may be so computed, but there the law imposes the limitation and the law imposes the disability. It is nothing, therefore, but a necessary legal logic that the one period should be taken from the other. If the law did not, by a necessary implication, take this time out of that prescribed by the statute, one of two things would happen: either the plaintiff would lose his right of suit by a judicial construction of law which deprived him of the right to sue yet permitted the statute to run until it became a complete bar, or else, holding the statute under the circumstances to be no bar, the defendant would be left, after the war was over, without the protection of any limitation whatever. It was therefore necessary to adopt the time provided by the statute as limiting the

---

1. The exhibits show, in correspondence on the subject, that letters by the defendant came from its "Adjustment Department."

2. There is also the fact that the transportation began in New York. Cf. Conklin v. Canadian-Colonial Airways, Inc., 266 N.Y. 244, 248-249, 194 N.E. 692.

right to sue, and deduct from that time the period of disability. Such is not the case as regards this contract. The defendant has made its own special and hard provision on that subject. * * * The condition is that no suit or action shall be sustainable unless commenced within the *time of twelve months next after the loss shall occur,* and in case such action shall be commenced after the expiration of twelve months *next after such* loss, the lapse of time shall be taken and deemed as conclusive evidence against the validity of the claim. Now, this contract relates to the twelve months next succeeding the occurrence of the loss, and the court has no right, as in the case of a statute, to construe it into a number of days equal to twelve months, to be made up of the days in a period of five years in which the plaintiff could lawfully have commenced his suit. So also if the plaintiff shows any reason which in law rebuts the presumption, which, on the failure to sue within twelve months, is, by the contract, made conclusive against the validity of the claim, that presumption is not revived again by the contract. It would seem that when once rebutted fully nothing but a presumption of law or presumption of fact could again revive it. There is nothing in the contract which does it, and we know of no such presumptions of law. Nor does the same evil consequence follow from removing absolutely the bar of the contract that would from removing absolutely the bar of the statute, for when the bar of the contract is removed there still remains the bar of the statute, and though the plaintiff may show by his disability to sue a sufficient answer to the twelve months provided by the contract, he must still bring his suit within the reasonable time fixed by the legislative authority, that is, by the statute of limitations."

In Thompson v. Phenix Insurance Co., 136 U.S. 287, 10 S.Ct. 1019, 1023, 34 L.Ed. 408, the insurance contract contained a clause, similar to clause 10 of the ticket here, limiting the time for bringing suit within twelve months from the date of the fire. Suit was not brought within that time. The Court said (per Harlan, J.): "While the validity of such a stipulation cannot be disputed (Riddlesbarger v. Hartford Ins. Co., 7 Wall. 386, 389, [19 L.Ed. 257],) we do not doubt that it may be waived by the company. And such waiver need not be in writing. It may arise from such a course of conduct upon its part as will equitably estop it from pleading the prescribed limitation in bar of a suit by the insured." Citing an Iowa case, Mr. Justice Harlan said further: "In the case last cited, it was properly said that it would be contrary to justice for the insurance company to hold out the hope of an amicable adjustment of the loss, and thus delay the action of the insured, and then be permitted to plead this very delay, caused by its course of conduct, as a defense to the action when brought."

In Lynchburg Cotton Mill Company v. Travelers' Insurance Company, 4 Cir., 149 F. 954, 956–957, 9 L.R.A.,N.S., 654, the policy contained a short period of limitations, but the defendant company, within that period, had engaged with the plaintiff in negotiations for a settlement. The court said: "Clause 14 was a limitation prescribed by the contracting parties in the interest of the insurer, and which should be construed most favorably for the insured. Steel v. Phenix Ins. Co., 9 Cir., 51 F. 715, 2 C.C.A. 463, 7 U.S.App. 325; Cotten v. Fidelity & Casualty Co., 5 Cir., 41 F. 506; 2 May on Insurance (3d Ed.) Sec. 478; 2 Wood on Fire Insurance (2d Ed.) 120. The insurer had the right to insist on the enforcement of this special limitation, but upon departing therefrom, certainly in the absence of express stipulation to the contrary, what was done operated, not as a suspension of the clause, but a waiver thereof, and after such waiver the general statute of limitations of the state, and not the special time named in the contract, governed the parties in the enforcement of the same. The reason for this is apparent, and this case is a striking illustration of what would be

the ill effect of a contrary doctrine. No one would ever know when, as to such contracts, the statute of limitations began or ceased to run. It would not be determinable from an examination of the contract, nor from the state statute, but would depend upon an uncertain and indefinite state of facts, as to which persons might think differently, and bring about a chaotic condition, which would be exceedingly undesirable. \* \* \* The insurer knowing his rights under the general law could afford to waive the clause in question, in order to effect an adjustment, and the assured likewise to make or entertain such a proposition, realizing that by so doing he would forfeit nothing, and upon failure proceed by suit within the statutory period to enforce his claim. The contrary view would result in making practically impossible any effort at compromise between the parties, certainly so far as the assured is concerned." The court cited Thompson v. Phenix Insurance Co., 136 U.S. 287, 10 S.Ct. 1019, 34 L.Ed. 408, and Semmes v. Hartford Insurance Company, 13 Wall. 158, 20 L.Ed. 490. See also Philadelphia Casualty Company v. Thacher, 1 Cir., 236 F. 869, 872.

In the leading New York case on the subject, Syracuse Lighting Co. v. Maryland Casualty Co., 226 N.Y. 25, 33-36, 122 N.E. 723, the court, citing Lynchburg Cotton Mills Co. v. Travelers Ins. Co., supra, reached the same conclusion on facts substantially similar to those here. See also George Colon & Co. v. Commercial Casualty Ins. Co., 226 App. Div. 525, 234 N.Y.S. 631; Graham Bros. Aktiebolag v. St. Paul Fire & Marine Ins. Co., 127 Misc. 403, 216 N.Y.S. 346;

Rego Building Corp. v. Maryland Casualty Co., 151 Misc. 801, 272 N.Y.S. 410.[3]

In citing insurance-contract cases, I follow the lead of my colleagues who, in discussing "English law" concerning waiver, cite and rely on Yorkshire Ins. Co. v. Craine [1922] A.C. 541.

2. My colleagues, in holding that there was no waiver or estoppel, rely principally on that English decision and on clause 20 which reads: "All questions arising on this contract ticket shall be decided according to English Law with reference to which this contract is made."

I think this clause does not import "English law" concerning a waiver after the injury occurred. For, at best, as my colleagues apparently concede, the words *on* this contract" are ambiguous, i. e., do not (to say the least) unambiguously cover the post-injury conduct, in New York, of defendant's claim agent.

Because the contract was made in New York, for a journey beginning in New York,[3a] the usual rule [3b] is that its provisions must be interpreted according to New York "law," [3c] or by the "maritime law" which, as previously noted, must (absent decisions on the subject) be learned from federal "law" as to internal transactions. What, then, of a provision, clause 20, which ambiguously refers to "English law?" Surely, in interpreting that ambiguous provision, we should not look to English decisions. Thus to consult "English law," in interpreting an American contract ambiguously referring to "English law," would indeed be a pulling-yourself-up-by-your-own-bootstraps device.[3d] Especially is

**3.** See also Illinois Livestock Insurance Co. v. Baker, 153 Ill. 240, 38 N.E. 627; Galloway v. Standard Fire Ins. Co., 45 W. Va. 237, 31 N.E. 969; Earnshaw v. Sun Mutual Aid Society, 68 Md. 465, 475, 476, 12 A. 884.

**3a.** Cf. Conklin v. Canadian-Colonial Airways, Inc., supra.

**3b.** Of course, dogmatism on the subject of conflict rules is out of place. No clearcut, certain and uniform rules exist. See

further, infra, point **7** of this opinion and note 22.

**3c.** See Scudder v. Union National Bank, 91 U.S. 406, 412, 23 L.Ed. 245: "Matters bearing upon the execution, and interpretation, and the validity of a contract are determined by the law where the contract is made."

**3d.** Cf. E. Gerli & Co. v. Cunard S.S. Co., 2 Cir., 48 F.2d 115, 117.

this true here, since the interpretation of a clause in a contract like this involves an important internal public policy. For, since the document was a fixed printed form prepared by defendant and tendered to the passenger, clause 20, under New York and federal decisions, must be construed most strongly against defendant. (Verbius fortuis accipuntur contra proferentum.) See, e. g., Aschenbrenner v. U. S. Fidelity & Guaranty Co., 292 U.S. 80, 84–85, 54 S.Ct. 590, 78 L.Ed. 1137; Graee v. American Central Ins. Co., 109 U.S. 278, 282, 3 S.Ct. 207, 27 L.Ed. 932, per Harlan, J.; Thompson v. Phoenix Ins. Co., 136 U.S. 287, 297, 10 S.Ct. 1019, 34 L.Ed. 408, per Harlan, J.; Gaunt v. John Hancock Mutual Life Ins. Co., 2 Cir., 160 F.2d 599, 602; Phoenix Mutual Life Ins. Co. of Hartford, Conn. v. Flynn, 83 U.S.App.D.C. 381, 171 F.2d 982, 984–985; Kenyon v. Knights Templar & Masonic Mutual Aid Association, 122 N.Y. 247, 25 N.E. 299; Lachs v. Fidelity & Casualty Co., 306 N.Y. 357, 118 N.E.2d 555; Moran v. Standard Oil Company, 211 N.Y. 187, 105 N.E. 217; Restatement of Contracts, Section 236(d); 3 Corbin, Contracts (1951) Section 599.[4]

This rule is given special emphasis when, as here, the contract contains a multitude of complicated provisions relative to a subject matter with which the tendering party is peculiarly familiar and the other party is not. See, e. g., Gaunt v. John Hancock Life Ins. Co., supra; cf. point 6 infra. There is an added fact, not here controlling but surely not to be ignored: The provisions of the ticket are printed in small type and in a crowded way.[5] While they are not wholly illegible, they are difficult to read, as any one will discover who tries reading them. (One can be sure that the steamship company does not thus print its advertisements addressed to prospective passengers.)

3. Although I think the foregoing sufficient to render "English law" inapplicable to the issue before us, the following factors are also pertinent:

(a) The New York and federal courts, in holding that there is a waiver in circumstances like those here, rest their decisions on the ground that "it would be contrary to justice" (or the like) to rule otherwise. Accordingly, we have here an important public policy of the forum which, I think, precludes the application of contrary English decisions.[6] In short, I do not agree with my colleagues' statement that, if the English "law" concerning waiver is as they report it,[7] it is not "oppressive to passengers."

(b) Consider a suit brought in this country on a contract made in England to be performed in England, and where a breach of the contract happened in England. Under the usual "conflict" rule, English "law" would be ordinarily decisive as to the interpretation of the contract.[7a] That "law" would not gov-

---

4. See also Texas & Pacific Ry. Co. v. Reiss, 183 U.S. 621, 626, 22 S.Ct. 253, 46 L.Ed. 358; London Assurance Co. v. Companhia De Moagens, 167 U.S. 149, 159, 17 S.Ct. 785, 42 L.Ed. 113; Southern Ry. Co. v. Coca-Cola Bottling Co., 4 Cir., 145 F.2d 304, 307; Stuart v. Franklin Life Insurance Co., 5 Cir., 165 F.2d 965, 967; Mt. Vernon Refrigerating Co. v. Fred W. Wolf Co., 6 Cir., 188 F. 164, 168; Christian v. First National Bank, 8 Cir., 155 F. 705, 709; Torrance v. Third National Bank, 3 Cir., 210 F. 806, 808.

5. Cf. Insurance Co. v. Slaughter, 12 Wall.

404, 407, 20 L.Ed. 444; 63 Harv.L.Rev. (1950) 494; Mellinkoff, How to Make Contracts Illegible, 5 Stanford L.Rev. (1953) 418.

6. See, e. g., The Kensington, 183 U.S. 263, 269–271, 22 S.Ct. 102, 46 L.Ed. 190; Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 461, 9 S.Ct. 469, 32 L.Ed. 788; Oceanic Steam Nav. Co. v. Corcoran, 2 Cir., 9 F.2d 724, 731–733, 57 A.L.R. 163.

7. As to which, see point 8, infra.

7a. I repeat that dogmatism is not possible. See note 3b, supra.

ern, I think, with reference to acts, in New York, asserted to be a discharge—by way of release, rescission, accord and satisfaction, or an account stated; see Restatement of Conflict of Laws, Section 373, Comments a and b.[8] Accordingly, I think "American law" governs the legal effect, as a waiver, of the New York conduct of defendant after the injury occurred.

4. Although, again, I think it unnecessary to support my conclusion, I note the following: My colleagues say that clause 20 must be read as referring not to "English law" as a "whole" but only to English intra-mural law, assigning as a reason for this interpretation that the major purpose of including the provision "was to assure Cunard a uniform result in any litigation no matter where the ticket was issued or where litigation arose, and this result might not obtain if the 'whole' law of England were referred to." But that argument runs into difficulties: In Mason v. Rose, 2 Cir., 176 F.2d 486, we hold that where English "law" is the "proper law," we must apply that "law" including its conflict rules. So that, even assuming, arguendo, that both parties here in clause 20 explicitly "chose" English "law" as applicable to the issue of waiver, they must be deemed to have intended that an American court, if litigation there arose, should decide the case just as if it were an English court. It is significant that Vita Products, Inc. v. Unus Shipping Company, [1939] A.C. 277—cited by my colleagues —construed a clause in a bill of lading providing, "This contract shall be governed by English law," to require the application of English conflict rules to such a contract, made and to be performed in another country; patently, the Privy Council did not consider that, because of the parties' explicit "choice" of "English law," the application of the "proper law," other than England's, should be disregarded in the interest of assuring "a uniform result."

5. My colleagues seem to concede that, on the motion for summary judgment, it must be assumed that the defendant's claim agent had actual or implied authority to waive the time limitation in clause 10. As, however, I may, in this respect, misunderstand my colleagues, I think it well to discuss the effect of clause 11 of the ticket. It reads: "The price of passage hereunder has been fixed partly with reference to the liability assumed by the company as defined by this contract, and no agreement, alteration or amendment creating any other or different liability shall be valid unless made in writing and signed for the Company by its Chief Agent at the point of embarkation." Defendant contends that this clause precluded any waiver or estoppel, by acts of defendant's claim agent, of the time limitation in clause 10.

I cannot agree. Once more I refer to the rule of strict construction, against defendant, of any ambiguity in such a printed form prepared by defendant. Now it will be noted that clause 11 relates solely to "liability." The ticket contains five clauses each of which specifically states circumstances in which the defendant shall have "no liability" or shall not be "held liable." [9] In other

---

**8.** Cf. Restatement of Conflicts, Section 350 as to an assignment.

**9.** Clause 4 says that "neither the vessel, her owner, etc., shall be or be *held liable* for loss of life or personal injury or delay to the passenger" arising from specific happenings.

Clause 7 states that there shall be *"no liability"* for loss of the passenger's documents and other valuables.

Clause 15 provides that the Company *"shall not be held liable"* for loss caused by riots, strikes, lockouts, labor disputes or labor disturbances.

Clause 16 provides that the Company *"is not to be, or to be held,* liable" for the act or neglect of any persons elsewhere than aboard the Company's ship or tenders.

Clause 22 provides that if the contract covers transportation "on a cruise," neither the Company, its agent or the ship "shall become or *be held liable"* for loss resulting from designated causes.

Emphasis added in the above.

words, in those five clauses we find what clause 11 means when it refers to written modification by the Chief Agent of "the liability assumed by the Company as defined by this contract." Significantly, clause 10, fixing the one-year time-limit for bringing suit, makes no mention of "liability." It reads, so far as pertinent: "No suit, action or proceeding against the Company or the ship, or the Agents of either, shall be maintainable for * * bodily injury to any passenger; unless * * * (b) the suit, action or proceeding is commenced within one year from the day when the * * * injury occurred."

I think, then, we must interpret clause 11 as having no application to clause 10. The former was obviously designed to cover no more than pre-voyage alterations of the company's "liability," since it provides for dealing with the Chief Agent "at the point of embarkation." [10]

Moreover, the federal and New York cases hold that, when such a contract provides that no change of liability shall be valid unless in writing and signed by a designated official, such a provision may be waived by acts, similar to those of the claim agent here, of agents of the obligor other than the official designated in the provision. [11] It has also been held that such clauses do not relate to the waiver of conditions to be performed after loss. [12] In *Scheibel v. Agwilines, Inc.*, 2 Cir., 156 F.2d 636, as we there noted, the asserted waiver occurred after the expiration of the contractual time-for-bringing-suit.

6. I call attention to another factor which, while unnecessary to my conclusion, I think supports it: The ticket is what has been called a "contract of adhesion" or a "take-it-or-leave-it" contract. In such a standardized or mass-production agreement, with one-sided control of its terms, when the one party has no real bargaining power, the usual contract rules, based on the idea of "freedom of contract," cannot be applied rationally. For such a contract is "sold not bought." The one party dictates its provisions; the other has no more choice in fixing those terms than he has about the weather. The insurance policy cases are outstanding examples, but there are many others. [13] Our courts, in particular contexts, have, in effect, nullified many provisions of such agreements, if unfair to the weaker party who must take-or-leave. Often our courts have done so by rather strained constructions of seemingly unambiguous language or by other indirect or "back-door" methods. [14] Referring to

10. I would think that that agent, at the point of embarkation, would not be the person to negotiate a settlement if the passenger, after the voyage, remained in a foreign country.

11. See, e. g., Strouse v. Union Indemnity Co., 2 Cir., 67 F.2d 528; Syracuse Lighting Co. v. Maryland Casualty Co., 226 N.Y. 25, 122 N.E. 723. See also New York Life Insurance Co. v. Rogers, 9 Cir., 126 F.2d 784; Biloz v. Tioga County Patrons' Fire Relief Association, Sup., 21 N.Y.S.2d 643, affirmed 260 App.Div. 976, 23 N.Y.S.2d 460.

12. Concordia Ins. Co. v. School District, 282 U.S. 545, 550–551, 51 S.Ct. 275, 75 L.Ed. 528; Strouse v. Union Indemnity Co., supra; Home Ins. Co. v. Hightower, 5 Cir., 22 F.2d 882, 62 A.L.R. 620.

13. See, e. g., Seasongood, "Drastic Pledge Agreements," 29 Harv.L.Rev. 277 (1916); 58 Yale L.J. (1949) 1161 notes 5, 8, 9, 10 and 11; 27 Col.L.Rev. 73, 80; New York Cent. R. Co. v. Lockwood, 17 Wall. 357, 379, 382, 21 L.Ed. 627.

14. Llewellyn, Book Review, 52 Harv.L.Rev. 700 (1939) says: [W]e have developed a whole series of semi-covert techniques for somewhat balancing these bargains. A court can 'construe' language into patently not meaning what the language is patently trying to say. It can find inconsistencies between clauses and throw out the troublesome one. It can even reject enforcement by one side for want of 'mutuality,' though allowing enforcement by the weaker side because 'consideration' in some other sense is present. Indeed, the law of agreeing can be subjected to diverse modes of employment, to make the whole bargain or a particular clause stick or not stick according to the status of the party claiming under it; as when, in the interest of the lesser party, the

such decisions, several brilliant commentators [15] have suggested that the courts forthrightly adopt a general doctrine which calls for refusal to enforce directly —i. e., without recourse to such indirect devices—highly unfair provisions of all so-called "contracts of adhesion" where there was no possibility of real bargaining. These writers urge that some decisions, in cases where this point of view was not presented to, or considered by, the courts should not now be deemed controlling. Their position is that of Holmes [16] and Corbin,[17] i. e., that the courts will do justice better by forthrightly, not obliquely, articulating important doctrines of public policy. The commentators on "adhesion" contracts do not at all suggest that all standardized contracts be stricken down, for they recognize that such contracts often serve a highly useful purpose where the parties are not markedly unequal in bargaining power (as in many "commercial" contracts).[18]

So far as I can discover, there is but one instance in which an American court has explicitly referred to this "adhesion" doctrine. See Bekken v. Equitable Life Assurance Society, 70 N.D. 122, 293 N.W. 200, 212: "It has been said that 'life-insurance contracts are contracts of "adhesion." The contract is drawn up by the insurer and the insured, who merely "adheres" to it, has little choice as to its terms.' 33 Harvard L. R. p. 222. Both the applicant and the insurance company are bound by the applicable laws and valid regulations promulgated pursuant thereto; but, except as so limited, the contract is prepared by the insurance company. The applicant may choose whether he will apply for insurance, * * * and which one of the several types of policies he prefers; but, his choice virtually ends with the right to apply for one or more of the contracts the insurance company has to offer." That aptly describes the position of the passenger here.

An ordinary contract has been called a sort of private statute, mutually made by the parties and governing their relations.[19] But in a take-it-or-leave-it con-

whole contract is conditioned on some presupposition which is held to have failed."

See Also Kessler, Contracts of Adhesion—Some Thoughts About Freedom of Contract, 43 Col.L.Rev. 629, 635 (1943) as to "back-door" judicial devices; cf. 58 Yale L.J. (1949) 1161, 1163–1164.

15. See, e. g., Kessler, Contracts of Adhesion, etc., supra; Llewellyn, Book Review, 52 Harv.L.Rev. 700 (1939); Patterson, The Delivery of a Life-Insurance Policy, 33 Harv.L.Rev. 198 (1919); Fuller, Basic Contract Law, 266 (1946); Carnahan, Conflict of Laws and Insurance Contracts (1942).

For the history of "adhesion" contracts, see Prausnitz, The Standardization of Commercial Contracts in English and Continental Law (1937).

16. See Holmes' view expressed in the following: Common Carriers and The Common Law, 13 Am.L.Rev. (1879) 609, 630, 631; The Common Law (1881) 1, 5, 35, 36, 68, 116, 204, 205; The Path of the Law, 10 Harv.L.Rev. (1897) 457, 466, 467; Frankfurter, The Early Writings of

O. W. Holmes, Jr., 44 Harv.L.Rev. (1931) 717, 719, 774, 779, 781 note, 791; Vegelahn v. Guntner, 167 Mass. 92, 104, 106, 44 N.E. 1077, 35 L.R.A. 722; Hudson County Water Co. v. McCarter, 209 U.S. 349, 355, 28 S.Ct. 529, 52 L.Ed. 828.

17. See 3 Corbin, Contracts (1951) 164, to the effect that "a better brand of justice may be delivered by a court that is clearly conscious of its own processes, than by one that states hard-bitten traditional rules and doctrines and then attains an instinctively felt justice by an avoidance of them that is only half-conscious, accompanied by an extended exegesis worthy of a medieval theologian."

18. Cf. Cerro De Pasco Copper Corp. v. Knut Knutsen, 2 Cir., 187 F.2d 990. There the shipper (as the record shows) was a financially powerful copper company. We held it bound by a provision in a bill of lading which provided that suit should be brought in Norwegian courts only.

19. See the French Civil Code No. 1134; Lawson, The Rational Strength of English Law (1951) 56–57.

tract, absent actual freedom to contract, the parties do not "legislate" by mutual agreement; the dominant party "legislates" for both. Salleilles, who in France in 1901, coined the phrase "contract of adhesion," used it to describe contracts "in which one predominant unilateral will dictate its law to an undetermined multiple rather than to an individual * * *, as in all contracts which, as the Romans said, resemble a law more than the meeting of the minds." [20]

All this has special pertinence here: A party, like the passenger here, having no real choice about the matter, cannot in fairness be said to have joined in a "choice of law" merely because the carrier has inserted a provision that some particular foreign "law" shall govern; therefore it would seem that that party should not be bound by such a provision. I shall not elaborate this point, since it is amply discussed in a recent excellent article, Ehrenzweig, "Adhesion Contracts in The Conflict of Laws," 53 Col.L.Rev. (1953) 1072, where most of the authorities are cited and considered.[21]

7. I grant that, in this context, I am stressing the need to do justice in particular instances. I do so unashamedly. For it is generally agreed that the decisions of conflict-of-laws cases by mechanized rules, without regard to particularized justice, cannot be defended on the ground that they have promoted certainty and uniformity, since such results have not been thus achieved.[22] Several wise commentators have urged that the element of justice should have a dominating influence.[23]

8. Finally, I am by no means sure that, even if English intramural "law" applied to the waiver, the result would be that which my colleagues report:

(a) I think that Yorkshire Insurance Company, Ltd. v. Craine [1922] 2 A.C. 541 does not bear out the interpretation my colleagues give it. There the plaintiff was the insured under two identical fire insurance policies issued by the two defendant companies. Each policy provided that the insured must deliver to the company a written claim containing as particular an account as is reasonably practicable of all property damaged or destroyed, and that the claim be delivered within fifteen days after the loss or damage or within such further time as the Company may in writing allow. Each

20. Cf. Lachs v. Fidelity & Casualty Co., 306 N.Y. 357, 118 N.E. 555. In Campbell Soup Co. v. Wentz, 3 Cir., 172 F.2d 80, the court refused to grant specific performance of an unfair contract of "adhesion" but indicated that it would rule differently in a suit at "law." It is difficult to see why such a ruling should be thus restricted. Our legal history discloses numerous instances in which "equitable" doctrines as to unfairness or the like have been adapted at "law." See, e. g., "law" cases concerning "unconscionable" contracts; Hume v. United States, 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393; Scott v. United States, 12 Wall. 443, 445, 20 L.Ed. 438; Kelley v. Caplice, 23 Kan. 474; 3 Corbin, Contracts (1951) 156. The doctrine of "frustration" in this country apparently began in "equity"—Willard v. Tayloe, 8 Wall. 557, 19 L.Ed. 501—but is now a "law" doctrine as well. And consider the development of "equitable defenses" in suits at "law"; 3 Corbin, Contracts (1951) 614–616.

21. See also Carnahan, Conflict of Laws and Life Insurance Contracts (1942) 245–250; Yntema, "Autonomy" in Choice of Law, 1 Am.J. of Comp.Law, 341, 353.

22. See, e. g., Cavers, A Critique of The Choice of Law Theory, 47 Harv.L.Rev. (1933) 173, 177; Rheinstein, Book Review, 28 Ind.L.Rev. (1953) 443; Rheinstein, Conflict of Laws in the Uniform Commercial Code, 16 L. & Contemp. Problems (1951) 114; cf. Goodrich, Directive or Dialectic, 6 Vand.L.Rev. (1953) 442; Goodrich, Yielding Place to New: Rest and Motion in The Conflict of Laws, 50 Col.L.Rev. (1950) 881.

23. See, e. g., Cavers, A Critique of The Choice of Law Theory, 47 Harv.L.Rev. (1933) 173, 178, 186 et seq.; Kronstein, Crisis of Conflict of Laws, 37 Georgetown L.Rev. (1949) 483, 484; Morris, The Proper Law of A Tort, 64 Harv.L. Rev. (1951) 881; Shaw, Savill, Albion & Co. v. The Fredericksburg, 2 Cir., 189 F.2d 952, 956; cf. Green, Judge and Jury (1930), 76–77, 97, 151.

policy further provided that the insurance company could take possession of the building within which the loss or damage occurred or of any property within the building at the time of the loss or damage, so long as the claim was not adjusted.

The plaintiff, having suffered a fire damage, filed particulars of the damage after the prescribed period. At the trial, there was evidence of negotiations between plaintiff and the defendants at the expiration date of the fifteen-day period and thereafter. The judge instructed the jury to find whether or not the defendants had represented to the plaintiff that they did not intend to rely on his tardiness in filing the claims. The jury found that they so represented, and had therefore waived their defenses. Nevertheless, the trial judge gave a verdict for defendants. The High Court of Australia reversed and entered judgment for plaintiff. The Privy Council, in affirming the High Court of Australia, did so on the ground that the insurer's conduct, in taking possession of the goods in question, constituted estoppel by conduct. The Privy Council did not pass on the question whether the defendant's conduct constituted an estoppel by representation, but said: "It has been well established by a long line of authority that in order to support a plea of estoppel by representation, the representation must be a representation of an existing fact, a promise or a representation of an intention to do something in the future is entirely insufficient, and this, though Lord Bowen said in Edgington v. Fitzmaurice that the state of a man's mind was as much a fact as the state of his digestion. In their Lordship's view it is impossible to say with any confidence whether the representation found by the jury to have been made —namely, that the defendants did not intend to rely upon the claims having been put in late—is a representation of an existing fact, a present existing resolve, or a promise or representation of an intention to do something in the future. Under those circumstances their Lordships think it more desirable to dis-

pose of the appeal on the ground of estoppel by conduct in going into possession, if that course be under the circumstances permissible, which they think it is." This passage, on which my colleagues rely, does not, I think, justify them in concluding that an English court would hold that the claim agent's statement in the instant case would not be a waiver or estoppel. And see Toronto Railway Company v. National British Millers Insurance Company, 3 Law Times 555, 563 (1914) in which the Court of Appeals said: "Conditions precedent may be waived by a course of conduct inconsistent with their continued validity, even though the contracting party does not intend his conduct to have that result." See also Wing v. Harvey, 5 De G.M. & G. 267, in which the court held that a clause of the insurance policy was waived by the acts of two local insurance agents, although the policy specified that only the directors of the company might waive it. Jones v. Oceanic Steam Navigation Co., Ltd., [1924] 2 K.B. 730, was a trial-court decision holding that a purser had no authority to waive a contractual provision, limiting the time for filing notice of claims, and that his representations therefore did not constitute a waiver of this provision; a purser's apparent authority in that respect is wholly unlike that of the claim agent here.

(b) My colleagues take, as an analogy, the English cases on the tolling or suspension of statutes of limitation. They cite no English cases using that analogy. The American cases, cited and discussed in point 1 of this opinion, have expressly rejected that analogy in situations involving a waiver, through settlement negotiations, of a contractual, as distinguished from a statutory, time limitation; they hold that the waiver operates to eliminate, not merely to suspend, the contractual provision. Absent English decisions, contra, I think we should assume that the English courts will so hold.

### Appendix.

The following is a facsimile of the ticket:

PRINTED IN U.S.A.

DEFENDANT'S EXHIBIT A

# CUNARD WHITE STAR LIMITED

NOTICE: The attention of passengers is specially directed to the terms and conditions of this Contract

**NOT TRANSFERABLE**

IN CONSIDERATION of the sum named in the margin of this contract, or if not named, for a valuable consideration, receipt of which is acknowledged, the Company agrees to provide transportation as specified herein for the person or persons mentioned unless the ship is prevented from sailing by some unforeseen occurrence and provided weather and other circumstances permit of the ship calling at the port of debarkation, and in the case of Transatlantic passengers only, if booked beyond the port of debarkation, the Company agrees to provide forwarding order thence to destination: AND IT IS MUTUALLY AGREED THAT THIS CONTRACT TICKET IS ISSUED BY THE COMPANY AND ACCEPTED BY THE PASSENGER ON THE FOLLOWING TERMS AND CONDITIONS:

1. Except as provided in this clause this contract is made between the passenger and Cunard White Star Limited and wherever the word "Company" occurs in this contract it refers to Cunard White Star Limited. If this contract, however, provides for transportation on board a vessel owned or chartered by Donaldson Atlantic Line Ltd, it is agreed that Cunard White Star Limited is acting as Agent for Donaldson Atlantic Line Ltd, with whom this contract shall be deemed to be made and that in such case wherever the word "Company" occurs in this contract it refers only to Donaldson Atlantic Line Ltd, and that in such case Cunard White Star Limited is not a party to this contract, assumes no responsibility for its performance, and is exempt from any liability under this contract or otherwise.

2. The ship shall have liberty to proceed without pilots, to tow and assist vessels in all situations, to put back or into any port at the discretion of the commander, and to deviate from the direct and customary course, and in the case of Trans-Atlantic passengers only, if the ship is prevented from sailing or proceeding in the ordinary course the Company and the ship shall have liberty to tranship the passenger at the Company's expense to any other ship bound for the port of destination whether belonging to the Company or not.

3. The ship shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages or otherwise howsoever, given by His Majesty's Government or any Department thereof, or by any person acting or purporting to act with the authority of His Majesty or of His Majesty's Government, or of any Department thereof, or by any Committee or person having under the terms of the War Risks Insurance on the ship, the right to give such orders or directions, and if by reason of and in compliance with any such orders or directions anything is done or is not done the same shall not be deemed a deviation.

4. Neither the vessel, her owner, agent or charterer shall be or be held liable for loss of life or personal injury or delay to the passenger, or for loss of or damage or delay to baggage or personal property of the passenger, arising from: danger of the sea or other navigable waters; acts of God or public enemies; barratry of master or crew; seizure under legal process; saving or attempting to save life or property at sea, or from any deviation in rendering such service; defect in the ship, machinery, gear or fittings, whether existing at the time of sailing or otherwise, provided the Company shall have exercised due diligence to make said vessel seaworthy and properly manned, equipped and supplied; or from any cause of whatsoever nature beyond the Company's control; and further as to baggage or personal property, for any loss or damage or delay resulting from faults or errors in navigation, or in the management of said vessel, or from any act or omission of the owner of said baggage or personal property, his agent or representative.

5. The passenger must take proper steps (including provision of all necessary documents) as may be required to enable him to land at his port of destination and generally to comply with the laws of the country in which such port is situate. The Company shall not in any circumstances whatsoever and whether or not such documents are produced to it by the passenger or information or advice as to the said Laws is given by it to the passenger be liable for the consequence of any insufficiency or irregularity in such documents or the non-compliance by the passenger with such Laws.

6. Twenty cubic feet of personal baggage for each adult passenger, or at the Company's option, 100 Kilos or 220 Lbs. will be carried by the Company's ship without additional charge and in the event of these amounts respectively being exceeded, the passenger shall pay at the current rate for baggage in excess thereof. But it is agreed that neither the Company, nor the passage broker or agent, nor the ship, is in any case liable for loss of, or injury to, or delay in the delivery of, baggage or personal effects of any passenger beyond the amount of FIFTY DOLLARS for each First class, Cabin class or Tourist class passenger at which sums respectively It Is Hereby Mutually Agreed that the same is valued and upon which valuation the price of passage hereunder is in part based, unless the value of the same in excess of these sums respectively be declared at or before the issuance of this contract, or at or before the delivery of said baggage to the ship, and unless additional compensation at the rate of 1% on such excess of value is paid thereon, (in which case the liability shall not exceed such specified value) and unless a special contract is made in duplicate and signed by the parties; and this agreement as to the extent of liability shall also apply to any baggage or property as to which the Company may have become liable as warehousemen either before or after the voyage, and to baggage or property placed or intended to be placed in the passenger's stateroom.

7. Documents, manuscripts, money, jewelry or valuables of any description, including such articles as are specified in Section 4281 of the Revised Statutes of the United States shall not be included in baggage and if included by the passenger no liability on account of such articles is assumed by the Company. The Purser will receive from the passenger sealed packages containing such articles or money and will place the same in the ship's safe and will give a written receipt therefor, but the Company is in no event liable for loss of, or injury to, or delay in delivery of the same and receives the same at the passenger's risk, unless the nature of the contents and the value thereof be declared by the passenger

---

Class Outward (Eastbound)   Form 12

Contract Ticket No. **E. 550843.**

Deck __B__   Room __198__   Berth __all__   374554

Ship __QUEEN ELIZABETH__

Sailing __NEW YORK__   [See Reverse for]
From. ..................   [Location of Piers]

Embarkation __September 20 1949__   Hours9 PM—Midnight
Date.                                  Local City Time

Passengers
Booked To __CHERBOURG__

Via.

| NAMES OF PASSENGERS | Ages | Male or Female | Married or Single |
|---|---|---|---|
| Mr. & Mrs. | AD | M | M |
| Elias Siegelman | AD | F | M |
| | | | |
| | | | |

Nationality __USA__   Occupation

| | Adults | Half | (Under ½) Infants | Servants | AMOUNT RECEIVED |
|---|---|---|---|---|---|
| Total Fare Show ½ One Way Fare If Round Trip Basis | 2 | | | | $515.00 |

Tax (If any) __Fr. Port Tax__   $ __11.50__

◄ SECOND FOLD      ◄ FIRST FOLD

and noted upon the receipt given him and unless a charge of 1% of the value thereof be paid thereon.

8. The passenger shall not be liable in respect of his baggage or personal effects to pay or be entitled to receive any general average contribution.

9. The passenger must see that baggage is distinctly labeled with his name, ship, date of sailing and destination, and if he shall fail to do so, the Company shall not be held liable for loss of the baggage or delay in delivery thereof.

10. No suit, action or proceeding against the Company or the Ship, or the agents of either, shall be maintainable for the recovery of baggage or property, or for damages for loss of, or injury to, or delay in delivery of the passenger's baggage or property, or for detention of the passenger, delay in landing him, or for breach of the terms hereof unless, (a) written notice of the claim be delivered to the Company at its New York address, namely 25 Broadway, New York, N. Y., within forty days after the termination of the voyage, and (b) such notice having been given, the suit, action or proceeding is commenced within one year after the termination of the voyage, and such suit, action or proceeding shall not be maintainable notwithstanding any provision of law of any State or Country to the contrary.

No suit, action or proceeding against the Company or the ship, or the Agents of either, shall be maintainable for loss of life or of bodily injury to any passenger unless (a) written notice of claim be delivered to the Company at its New York address, namely 25 Broadway, New York, N. Y., within six months from the day when the death or injury occurred, and (b) such notice having been given, the suit, action or proceeding is commenced within one year from the day when the death or injury occurred.

11. The price of passage hereunder has been fixed partly with reference to the liability assumed by the Company as defined by this contract, and no agreement, alteration or amendment creating any other or different liability shall be valid unless made in writing and signed for the Company by its Chief Agent at the port of embarkation.

12. If this contract ticket is not received from the Company by the passenger, then the person who receives the same shall be deemed to be the agent of the passenger named herein for all purposes of this contract.

13. Any additional taxes or other charges levied by the United States and/or any other government must be borne by the passenger.

14. If the passenger does not use this contract ticket for the ship and date therein mentioned, or if it is lost or mislaid, it is to be considered as cancelled and the passage money absolutely forfeited.

15. The Company shall not be held liable for loss, damage, or delay to passengers or baggage howsoever or wheresoever occurring caused directly or indirectly by riots, strikes, lockouts, labor disputes or labor disturbances of any kind, or by the course of action adopted by the Company or other persons whomsoever in contemplation or consequence thereof, or in connection therewith.

16. In making any arrangements for the care or transportation of any passenger or his or her baggage by any connecting or other carrier, railway, vessel, craft, transportation company, tramway, carriage, automobile, aircraft, or otherwise howsoever than by the Company's ships or such tenders as are supplied at the sole expense of the Company to embark or disembark passengers in or from the same, or in making any arrangements for shore accommodation victualling amusement or entertainment for any passenger, or for any other service or facility whatsoever for any passenger otherwise than aboard the Company's ships or the tenders aforesaid, it is understood and agreed that the Company is merely acting in the capacity of agent for the party or parties actually providing such care transportation accommodation victualling amusement entertainment service or facility aforesaid, and that the same are provided subject to the terms appearing in the tickets vouchers or notices for the time being in force of such party or parties or otherwise imposed by such party or parties. It is further understood and agreed that the Company is not to be, or to be held, liable for the act, neglect, default, or omission of any party whomsoever in respect of any events, matters or things, whatsoever or wheresoever, elsewhere than aboard the Company's ships or such tenders as are supplied at the sole expense of the Company for the purpose of embarking or disembarking passengers in or from the Company's ships.

17. In case of quarantine each passenger must personally bear all risks and expenses thereby caused, including the cost of maintenance during the period of detention.

18. The Company reserves the right to cancel any scheduled call at any port for any reason at its option at any time whether before or after the sailing of the vessel, without previous notice to the passenger, and without liability to the passenger for any loss damage or delay whatsoever howsoever consequential thereon, but if the port of debarkation named in this contract ticket is a scheduled call to cancelled then—

(a) If such scheduled call be cancelled before the sailing of the vessel the Company shall at the option of the passenger either—

(1) refund to the passenger the full amount of the passage money, whereupon this contract shall be terminated without any further liability whatsoever on the part of the Company to the passenger, or

(2) furnish to the passenger orders, tickets or vouchers by sea and/or rail, at the case may be, to the port of debarkation named in this contract ticket from the nearest port at which the vessel calls to such port of debarkation, in which event the transit of the passenger to such port of debarkation from the time of leaving the Company's vessel shall be at the sole risk of the passenger in every respect and the Company shall be under no further liability whatsoever to the passenger.

(b) If such scheduled call be cancelled after the sailing of the vessel the Company shall furnish to the passenger orders, tickets or vouchers for transportation in accordance with and upon the terms set out in sub-clause (a-2) immediately preceding.

19. The right is reserved to refuse passage to anyone in such a state of health or physical condition as to be unfit to travel or whose condition through disease or otherwise may be dangerous or obnoxious to other passengers.

20. All questions arising on this contract ticket shall be decided according to English Law with reference to which this contract is made.

21. If this contract is issued in connection with a "round trip" and/or for passage during an "off season" and at a reduced rate, it is available for passage only during the periods applying thereto as advertised in the Company's rate schedule in effect at the time of booking, unless the passenger pays the difference between said reduced rate and the regular fare.

22. If this contract provides for transportation on a cruise, or any part thereof, and not for a Transatlantic voyage, it is mutually agreed that it is issued by the Company and accepted by the passenger upon the following additional terms and conditions:

Neither the Company, its agent or the ship, shall become or be held liable for damage or loss resulting from faults or errors in navigation or in the management of the ship or her boats, equipment, fittings or appurtenances, from dangers of the sea or other navigable waters, stranding, fire, breakdown of machinery, propellers, rudder or equipment, Acts of God or public enemies, or seizure under legal process, or from failure to release the ship from such seizure, or from saving or attempting to save life or property at sea or from any deviation in rendering such service, or from any cause beyond the Company's control and if from any of these causes or what-soever, the ship shall be prevented from or delayed in proceeding on the voyage herein described at any stage thereof, or if it becomes in the judgment of the master of the ship unsafe or unwise to so proceed, the cruise may be terminated or curtailed and neither the Company, its agent or the ship, shall become or be held liable for damage or loss resulting from such termination or curtailment, or for a refund of any part of the passage money.

---

European | Rail Fare .......... $526.50

Total Amount Received ........ $ ..........

ROUND TRIP INCLUDES WESTBOUND FARE AS PER FOLLOWING

| NET VALUE | Good for Accom Value |

SHIP ..........

SAILING DATE ..........

EASTBOUND TICKET

**SPECIMEN COPY**

| Adults | Half | Quarter | Free |

**FOR THE COMPANY:**

Agent's Signature .......... COMPASS TRAVEL BUREAU, INC. ..........

Place of Issue .......... New York ..........

Date of Issue .......... September 9, 1949 ..........

TO FIT READILY IN SPECIAL TICKET ENVELOPE FOLD AS INDICATED

Cunard White Star Ltd

EXAMINED

Cabin Class

# CUNARD WHITE STAR LIMITED

## NOTICE TO PASSENGERS

Passengers must identify and claim their baggage from the Baggage Master on the pier before it will be put on board the ship.

Baggage required during the voyage must be distinctly labeled to this effect before embarking.

This ticket will be collected immediately after sailing.

The Purser will collect the difference on any children not specified in the ticket or where misrepresentation has been made as to age.

Passengers should arrange to be at the Pier at least two hours before time appointed for sailing in order to have sufficient time to check their baggage, have their tickets examined, etc., etc. Unless this is done passage will not be guaranteed as the ships sail promptly at the appointed time.

## LOCATION OF COMPANY'S PIERS

NEW YORK { Piers 54-56, North River, foot of West 14th Street and
{ Pier 90, North River, foot of West 50th Street
BOSTON_____Cunard White Star Pier, East Boston
SAINT JOHN_____

HALIFAX_____Piers 20, 21, 22, Southern Terminals
MONTREAL_____Sheds 2, 3 and 5, Foot of St. Francois Xavier Street
QUEBEC_____Pier No. 29
Ships dock in West Saint John

## U. S. OFFICES

NEW YORK, N. Y. (Main Office)—Cunard Building, 25 Broadway or
441 Park Ave. corner 56th St.
BALTIMORE, MD._____1015 American Building
BOSTON, MASS._____393 Boylston Street
CHICAGO, ILL._____41 So. La Salle Street
CLEVELAND, OHIO_____1414 Euclid Avenue
DETROIT 26, MICH._____512 Book Building
LOS ANGELES, CAL._____606 South Hill Street

MINNEAPOLIS, MINN._____Suite 2220, Foshay Tower
PHILADELPHIA, PA._____1616 Walnut Street
PITTSBURGH, PA._____444 Oliver Avenue
PORTLAND, ME._____142 High Street
ST. LOUIS, MO._____311 North 11th Street
SAN FRANCISCO, CAL._____210 Post Street
SEATTLE, WASH._____Exchange Building
WASHINGTON, D. C._____1304 K Street, N. W.

## CANADIAN OFFICES
### OF CUNARD DONALDSON, LTD.

HALIFAX, N. S._____Granville and George Streets
MONTREAL, QUE._____230 Hospital Street, P. O. Box 2550
QUEBEC, QUE._____57 St. Peter's Street
WINNIPEG, MAN._____

ST. JOHN, N. B._____162 Prince William Street
TORONTO, ONT._____Bay and Wellington Streets
VANCOUVER, B. C._____626 W. Pender Street
224 Portage Avenue